Filed 7/29/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BRENDAN ROCHE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS F. HYDE,<br><br>Defendant and Appellant. | A150459<br><br>(Sonoma County<br>Super. Ct. No. SCV259143) |
| BRENDAN ROCHE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAM'S GATE WINERY, LLC, et al.,<br><br>Defendants and Appellants. | A150462<br><br>(Sonoma County<br>Super. Ct. No. SCV259143)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT:

The respective petitions for rehearing filed by appellants Ram's Gate Winery, LLC, Michael John and Jeffrey B. O'Neill, and by appellant Thomas F. Hyde, are denied, subject to the following modification of the opinion filed in these consolidated appeals on June 30, 2020:

1. On page 40, in the first full paragraph, delete the following sentence:

> Because the Boudreau Report was among the materials in the 2005 Due Diligence Binder, marked with a tab and clearly identified, Hyde knew it had been in Hardy's possession, and he knew it revealed the very information he was advising Ram's Gate to sue Roche for failing to disclose.

1

2. Insert in place of the deleted sentence on page 40, continuing within the same paragraph, the following substitute language:

> According to a November 18, 2016 declaration Hyde filed in connection with the anti-SLAPP motions, the first two pages of this volume consisted of a "Binder Index" organized as a table of contents, listing the documents in it by numbered tabs. Because the Boudreau Report was among the materials Hyde received from Hardy, marked clearly—"Geologist's Report, July 12, 1987"—and identified by tab number on this index, Hyde knew it had been in Hardy's possession, and he knew it revealed the very information he was advising Ram's Gate to sue Roche for failing to disclose.

The modifications effect no change in the judgment.

Dated: July 29, 2020                                          POLLAK, P. J.

| | |
|---|---|
| Trial court: | Sonoma County Superior Court |
| Trial judge: | Honorable René Auguste Chouteau |
| Counsel for defendant and appellant Thomas F. Hyde: | Hinshaw & Culbertson<br>Edward F. Donohue<br>Jared W. Matheson |
| Counsel for defendants and appellants Ram's Gate Winery, LLC et al.: | Arnold & Porter Kaye Scholer<br>Steven L. Mayer<br>Sean M. SeLegue<br>Jonathan W. Hughes<br>John S. Throckmorton |
| Counsel for plaintiff and respondent: | Beyers Costin Simon<br>Bob Haroche<br>Peter L. Simon<br>Steven J. Bleasdell |

A150459 / A150462

3

Filed 6/30/20 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| BRENDAN ROCHE,<br><br>    Plaintiff and Respondent,<br><br>              v.<br><br>THOMAS F. HYDE,<br><br>    Defendant and Appellant. | A150459<br><br>(Sonoma County<br> Super. Ct. No. SCV259143) |
| BRENDAN ROCHE,<br><br>    Plaintiff and Respondent,<br><br>              v.<br><br>RAM'S GATE WINERY, LLC, et al.,<br><br>    Defendants and Appellants. | A150462<br><br>(Sonoma County<br> Super. Ct. No. SCV259143) |

In 2006, Ram's Gate Winery, LLC (Ram's Gate) purchased a Sonoma County winery from Dr. Joseph G. Roche (Roche) and his wife. Ram's Gate later sued the Roches for breach of contract, fraud, and negligent nondisclosure based on claims they withheld seismic information about the property and made misstatements concerning the ability to build on an existing building pad. The protracted litigation ultimately ended with Ram's Gate dismissing the action, Roche paying nothing to Ram's Gate, and Ram's Gate paying most but not all of Roche's attorney fees.

1

Roche then brought a malicious prosecution suit against Ram's Gate, two of its members, Michael John and Jeffrey O'Neill (collectively, Ram's Gate or the Ram's Gate defendants), along with their attorney, Thomas Hyde (collectively with Ram's Gate, the defendants), alleging they withheld documents in discovery that would have proved they knew or should have known the seismic information they claimed was kept from them when they bought the property from Roche. The defendants filed special motions to strike the complaint as a strategic lawsuit against public participation (anti-SLAPP motions).

Following denial of their anti-SLAPP motions, the Ram's Gate defendants and Hyde separately appealed. Though they largely take a common position in these now consolidated appeals, Ram's Gate and Hyde have appeared separately and have filed separate briefs, as they did in the trial court. Together, the defendants attack the denial of their anti-SLAPP motions from many angles—necessitating the extended discussion to follow—but at its core the single issue before us, put simply, is whether Roche made a sufficient showing that he was likely to succeed on the merits. We conclude he did and therefore affirm.

## I. SUMMARY

While the ultimate issue may be put simply, that is not so for the case as a whole. We therefore pause at the outset to provide a summary of the key points of decision, intending with this précis to set forth an outline of what will follow. The two primary legal issues presented are (1) whether Roche met his prima facie burden of proving the underlying action was terminated in his favor and (2) whether Roche met his prima facie burden of proving Ram's Gate lacked probable cause to bring or maintain the underlying action against him.

Taking the favorable termination issue first, we begin with the principle that a unilateral dismissal raises a presumption of favorable termination.  (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400 (*Sycamore Ridge*).)  To determine whether the presumption has been rebutted, we evaluate the circumstances of the dismissal.  (See *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 217 (*Daniels*).)  Here, that situational inquiry boils down to this:  Where the underlying suit was unilaterally dismissed by Ram's Gate in the face of a terminating sanctions motion that was almost certainly going to be granted for discovery abuse, and where the dismissal was accompanied by a negotiated payment of some but not all of Roche's attorney fees—with Roche signing no settlement agreement, releasing no claims, and expressly reserving his rights—did the dismissal constitute a favorable termination in favor of Roche?  On this record, we hold that the answer is yes.  Because the modest discount on attorney fees that Ram's Gate received was a matter "ancillary" to the merits, under *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 215 (*HMS Capital*) it did not constitute a settlement.

The probable cause issue breaks down into four component parts, one of which is substantive and three of which are procedural.

First, as a substantive matter, we conclude that Roche has met his burden of showing that, under the tenability standard announced in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863 (*Sheldon Appel Co.*), no reasonable attorney would have brought or maintained an action against Roche in these circumstances.  In arriving at that conclusion, we address the following two questions:  (1) Where transactional counsel for Ram's Gate had possession of allegedly concealed information prior to the closing of the sale, is knowledge of that information chargeable constructively to Ram's Gate by

3

imputation under applicable agency principles? And (2) even if the allegedly concealed information is imputed to Ram's Gate, did Ram's Gate nonetheless have probable cause to sue on other grounds because it asserted various alternative theories of liability? On this record, we hold the answers to these questions are, respectively, yes, that under *Wittenbrock v. Parker* (1894) 102 Cal. 93 (*Wittenbrock*), Ram's Gate must be constructively charged with information in the hands of its transactional counsel, and no, that none of Ram's Gate's alternative theories of liability supplies an independent basis for probable cause because under *Cuevas-Martinez v. Sun Salt Sand, Inc.* (2019) 35 Cal.App.5th 1109 (*Cuevas-Martinez*), none states an independent cause of action.

Second, under the interim adverse judgment rule as enunciated in *Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767 (*Parrish*), does a summary adjudication ruling in the underlying case in favor of Ram's Gate, finding triable issues of fact on several of Ram's Gate's claims of nondisclosure and misrepresentation, compel a finding as a matter of law that Ram's Gate had probable cause to sue? That issue, in turn, requires us to decide whether an exception to the interim adverse judgment rule recognized in *Carpenter v. Sibley* (1908) 153 Cal. 215 (*Carpenter*) for judgments procured by fraud or perjury applies. As a matter of first impression, we hold that egregious discovery misconduct—here, the withholding of a critical piece of evidence in willful violation of multiple court orders, including a sanctions order, where the suppressed evidence likely would have resulted in a summary judgment victory for Roche—may provide a basis for applying the fraud or perjury exception under *Carpenter*. And we think the evidence supplies a prima facie basis for applying the exception in this case.

4

Third, in evaluating the merits of whether Roche bore his prima facie burden on lack of probable cause, must we draw all inferences for a malicious prosecution defendant seeking anti-SLAPP dismissal, contrary to the usual rule that, on review, we draw inferences for the non-movant in the " ' "summary-judgment-like" ' " (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*)) proceedings at step two of the anti-SLAPP process?  Pointing to the principles of tenability announced in *Sheldon Appel Co.* as they have been applied in *Parrish* and other cases, and emphasizing that this body of precedent establishes a substantive standard of liability that is highly generous to those accused of malicious prosecution, the defendants urge us to adopt a novel procedural exception and draw inferences for the movant and malicious prosecution defendant.  We reject these arguments and apply conventional standard of review principles applicable to the review of anti-SLAPP denials, drawing all inferences in favor of the non-moving party and malicious prosecution plaintiff, Roche.

Fourth, how will the law of the case doctrine apply in this case going forward, on remand, following our affirmance of the denial of the defendants' anti-SLAPP motions?  We hold that, as to triable issues of fact, the only impact of the law of the case doctrine is to preclude a summary judgment motion by any of the defendants asserting the same grounds asserted in their anti-SLAPP motions, unless they later come forward with "additional or different evidence that would, as a matter of law, conclusively negate plaintiff's prima facie case."  (*Bergman v. Drum* (2005) 129 Cal.App.4th 11, 18 (*Bergman*), italics omitted.)  Following remand, therefore, the case may now proceed to trial, where Roche will have the burden of proving all elements of his malicious prosecution claim.  At trial—except for rulings

5

made in this opinion on issues of law on undisputed facts, which will provide binding guidance as the law of the case—the inferences we draw here from the record evidence shall have no effect on the matters to be tried.

## II. BACKGROUND

### A. *History of the Winery Purchase*

#### 1. The Conforti Site Plan and the Boudreau Report

In the late 1980's, Roche and his wife, Genevieve,[1] purchased a 135-acre ranch in Sonoma County with the plan of establishing a winery on it. That they did, but not before commissioning two studies of the property. The first, a site plan depicting the location of the winery building and its orientation on the site, was prepared by architect Victor Conforti in February 1987 (the Conforti site plan). The second, a report by an engineering geologist, Eugene Boudreau, was prepared in July 1987 (the Boudreau Report). Boudreau's work was a seismic hazard study specifically required by the county because the property is located in a seismic special studies zone. (See Pub. Resources Code, § 2621 et seq. [Alquist-Priolo Earthquake Fault Zoning Act].)

The Boudreau Report concluded that "[t]he principal hazards in the area are associated with faulting and earthquakes[.]" The report summarized the findings of a 1982 "fault evaluation report" by geologist E.W. Hart from the California Division of Mines Geology (CDMG), which showed

---

[1] Dr. Genevieve Roche passed away during the underlying litigation, and Dr. Joseph Roche passed away during the pendency of these appeals. Only the late Dr. Joseph Roche was a party to the malicious prosecution action. He has been succeeded in these appeals by a personal representative of his estate. Although the Roches appear to have been co-owners of the Roche Winery, we will recite the facts as if Dr. Joseph Roche had been the sole owner of the winery, without reference to any role his wife may have played in establishing and running it.

6

"the Rodgers Creek Fault Zone to run from Santa Rosa to the Roche property."[2]  "[T]he Rodgers Creek is definitely considered to be an active fault."  Drawings accompanying the report showed multiple fault traces on the Roche property, including one within 20 feet of the proposed winery site.[3]

This fault trace, which Boudreau located at the "southernmost portion of the Rodgers Creek [Fault], which includes the Roche property," was originally identified by the CDMG, as shown by a map prepared by Hart in 1982.  Based on topographical features of the site, the Hart map delineates several "traces of recently active faults traversing the area east of Arnold Drive . . . to the north of the winery site," roughly at the intersection of two underlying rock formations known as the Petaluma formation and the Sonoma volcanics.  Boudreau, too, looked at topographical features of the site

---

[2] The term "fault," in common usage, sometimes refers to what geologists would describe as a "fault zone" (e.g., the San Andreas Fault, or the Hayward Fault, or the Rodgers Creek Fault).  Within fault zones, there are tributary faults, known to geologists as "fault traces."  Whether a "fault" or a "fault trace" is deemed to be "active" depends on the recency of its seismic activity.

In this opinion, we will use the official name of the fault zone at issue here (i.e., the Rodgers Creek Fault) where we believe that is the intended meaning of the witness or document being referenced.  Except for occasional instances where we use the nonspecific term "fault" in quoting from testimony or documentary exhibits (because these source materials are sometimes not specific), we will generally use the specific term "fault trace," since, on this record, as we read it, that is nearly always the contextual meaning.

[3] Boudreau attached a map, drawn to 1:200 foot scale, showing the location of these fault traces.  The map has two arrow indicators, one bearing the annotation "Active fault traces from CDMG map by Hart" which points to two discontinuous solid lines located approximately 40-feet from the proposed winery building, and the other bearing the annotation "possible fault" which points to a dotted-line approximately 20-feet from the proposed winery building.

7

and other observed surface conditions, but he did some analysis of the soils by excavation as well.

Using Hart's earlier map as a starting point, Boudreau dug exploratory trenches at the location of the "possible fault" nearest to the location of the proposed winery building. Observations of the soils revealed by these trenches showed a "fault plane" at that location. Hart himself—whom Boudreau consulted—confirmed Boudreau's opinion after examining Boudreau's trenches, but also advised Boudreau that further confirmation could be found if deeper trenches were dug. While Boudreau ultimately found no evidence of recent seismic activity in the excavated soil, he concluded that "a possible fault (which will have to be considered to be potentially active) was discovered north of the site, but a 50 foot clearance can be kept between the fault trace and the building."

Boudreau's findings thus made it clear the site initially considered for the winery was very close to multiple active fault traces, and nearly on top of one he suspected to be active. His drawings noted a location that would allow the required 50-foot setback from this suspected active fault trace. The Conforti site plan was revised in 1988, evidently to take account of Boudreau's findings. The Conforti site plan is less detailed geologically than the drawings prepared by Boudreau, but does show a fault trace that appears to correspond to the one Boudreau identified nearest to the proposed winery. It is clear from Conforti's site plan that he did not make an independent judgment as to the location of any trace fault. One sheet of his plan includes an annotation with a pointer to a line indicating "Geologist Fault Trace Exploratory Trench," and on another sheet he has a similar pointer with a note "Trace Fault Line Field Confirm Location by Geologist."

## 2. The Giblin Report, the Harding Lawson Proposal, and the Offering Memorandum

The next chapter in these events concerns the building pad.  In 1996, the California Department of Transportation (CalTrans) undertook a highway widening project on Highway 121, adjacent to the Roche Winery.  Ghilotti Construction (Ghilotti), the contractor doing the work, needed a place to offload gravel and soil from the roadwork operations.  Ghilotti suggested using the old road base to build a two-acre building pad behind the winery at no cost to Roche.  Thinking he could use it to put up a warehouse, Roche agreed.  The pad was built by Ghilotti under monitoring and inspection by the geotechnical engineering firm Giblin Associates (Giblin).  Giblin provided Ghilotti with a final report (the Giblin Report) indicating the pad had been built in accordance with grading plans prepared by civil engineers, and Ghilotti gave a copy of the final Giblin Report to Roche.

Roche solicited a proposal from a second geotechnical engineering firm, Harding Lawson Associates (HLA), to perform a fault hazard investigation for a planned warehouse to be constructed on the two-acre building pad built by Ghilotti (the HLA Proposal).  The HLA Proposal specifically recommended that to satisfy the requirements of the Alquist-Priolo Earthquake Fault Zoning Act, a fault hazard investigation be undertaken before erecting the planned warehouse.  Roche never completed the additional seismic investigation recommended by HLA and never built the warehouse.

By early 2005, Roche Winery had filed for Chapter 11 protection in bankruptcy, and Roche sought to sell the winery, initially listing it for $10.5 million.  The real estate broker for the sale, Catherine Somple, wrote the text of an Offering Memorandum about the property that, among other things, summarized the history of the building pad, concluding with the following statement:  "[Ghilotti built] the winery a free-of-charge, fully engineered,

9

Sonoma County approved building pad. You can literally start building on it w/ no ground work. It was always the Sellers [*sic*] long term plan to construct a 'cut and cover' building there for production, and turn the current facility into a pure retail/office location."

### 3. 2005 Attempt To Purchase the Winery

The transactional history of Ram's Gate's eventual purchase of the winery unfolded over the course of two years, starting in mid-2005. In July 2005, Michael John and John Hansen launched an effort to buy the winery and formed a limited liability company (LLC), JHP Land, LLC (JHP Land I), for that purpose. John and Hansen both were managers of JHP Land I. Their plan was to replace the existing winery with a new one that would be open to the public, sell specialty groceries, and be available to rent for special events. Carrying out that plan would have required expanding the property's permitted uses under Sonoma County's zoning law. For JHP Land I, whether the county would grant a use permit allowing new uses of the property was therefore a key issue.

John and Hansen were represented by broker and attorney Lester Hardy and his law firm of Clement, Fitzpatrick & Kenworthy (the Clement firm)[4] in the formation of JHP Land I and the purchase of the winery. The agreed-upon purchase price was $10 million. In connection with the purchase, the buyers received a set of broad written disclosures from Roche. On July 21, 2005, Roche sent to Hardy a "Roche Winery Disclosure List"

---

[4] The main office of the Clement firm was, and still is, in Santa Rosa. Hardy worked out of a satellite office in St. Helena.

which indicated "None" on lines requesting information about "Geological Hazards" and "Geotechnical Reports."[5]

Although the main focus of Hardy's preliminary due diligence work was on permitting issues, he did have some limited discussions with the Roches' counsel, Thomas Davenport, about seismic matters. The Roches, who lived on a ranch across Arnold Drive several hundred yards to the north of the winery, wished to retain water rights to a well located on the winery site. Concerned that these retained rights could affect water capacity for the winery, Hardy asked Davenport whether the Roches could simply drill a well on their side of Arnold Drive. According to Davenport, the answer was no because there was a "fault" on the winery site between the water-bearing rock formation from which the winery's well drew and the rock formation on the other side of Arnold Drive, where the Roches lived.

To help gather preliminary due diligence information, a law partner of Hardy at the Clement firm, Kathleen Winter, reviewed documents on file with the county's Permit Resource Management Department (PRMD) relating to the Roche property, copying some of them and placing them into binders. One of these binders contained the Boudreau Report. An email from Davenport to Hardy dated August 1, 2005, says a binder of "disclosure documents" was being hand-delivered to Hardy that day. In addition, an email dated July 27, 2005, from Davenport to Hardy forwarding an email from Roche's son, Brendan Roche, indicated that various materials were

---

[5] The disclosure sheet divided the responses into seven categories of information, "Violations," "Sewer," "Illegal/Hazardous," "Asbestos," "Existing Agreements/Contracts," "Reports," and "Other Facts, Conditions or Agreements." The "[n]one" response for "Geological Hazards" appears in the category for "Violations" and the "[n]one" response for "Geotechnical Reports" appears in the category for "Reports."

11

being provided to Hardy, including "[a] [t]hree-ring binder cataloguing the construction of the winery, including engineering information, seismic information, plumbing, refrigeration, etc. THESE ARE ALL ORIGINALS. Please look through it and make copies as needed, and return to us at your convenience."[6]

By mid-August 2005, John and Hansen lost interest in purchasing the property because, considering restrictions expected to be imposed by the county, the cost of building and running the winery would have made it impossible to service the debt. Accordingly, on August 11, 2005, John wrote a letter to Roche and his son Brendan, terminating the deal and explaining why. That marked the conclusion of Hardy's representation of JHP Land I in 2005. Later, John, through out-of-state lawyers, canceled the registration of JHP Land I with the California Secretary of State.

---

[6] Roche contends a copy of the Boudreau Report was contained in a binder prepared by Brendan Roche and provided to Ram's Gate through Davenport in 2005. In ruling on the defendants' anti-SLAPP motions, the trial court sustained Ram's Gate's objections to consideration of Brendan's declaration. These objections were made on multiple grounds, including lack of foundation and speculation (because, according to Ram's Gate, Brendan failed to identify exactly what he sent Davenport and had no personal knowledge of what Davenport sent Hardy) and judicial estoppel (because Roche had not claimed in the underlying action that Brendan provided the binder, but rather that he never possessed a copy of the Boudreau Report and the only copy he knew of was on file with the county). Roche does not challenge the court's ruling on the objections. Because we conclude the source of the binder does not matter for present purposes (at pp. 42–43, *post*), we will treat the binder containing the Boudreau Report as having originated with Winter (at pp. 42–43, fn. 21, 56–57, *post*), not Roche's son. Because it ended up in Hardy's hands in connection with his preliminary due diligence investigation in 2005, we will sometimes call it the "2005 Due Diligence Binder."

After JHP Land I backed out of the deal, Davenport asked for the return of disclosure materials Roche had provided in July and August 2005, as required under the parties' agreement, because many of them were originals. JHP Land I and Hardy never complied with that request.

### 4. 2006 Purchase of the Winery

a. *Purchase and sale agreement*

In January 2006, Roche again put the winery on the market, asking the reduced price of $8.5 million. John and Hansen found another investor, O'Neill, and the three formed an entity initially known again as JHP Land, LLC (JHP Land II), but which eventually was called Ram's Gate Winery, LLC.[7] With Roche under time pressure from his lender, the three investors, who were all initially designated managers, negotiated to buy Roche's winery for $7 million. They again retained Hardy, now in his own firm,[8] to represent them in setting up Ram's Gate and handling the purchase of the property.

The parties entered into a purchase and sale agreement (PSA) on November 15, 2006. The name of the contracting purchaser was recorded as "JHP Land, LLC"—the same name as the entity Roche had dealt with in 2005. Roche and his attorneys, Davenport and Peter Simon, all have sworn under oath they did not know they were dealing with a different entity (JHP Land II) in 2006 than they had dealt with in 2005 (JHP Land I).

b. *Required disclosures*

The PSA required Roche to produce to Ram's Gate, within 10 days, documents including "any known geological hazards; . . . soil reports, . . . geotechnical reports, . . . and all other facts, events, conditions or agreements

---

[7] The LLC changed its name to "Carneros Vintners, LLC" in 2008 and to "Ram's Gate Winery, LLC" in 2010.

[8] In early 2006, Hardy left the Clement firm and set up a solo practice.

which have a material effect on the value of the ownership or use of the Property. . . ." Ram's Gate then had 13 days in which to conduct its due diligence inquiry and to decide whether to go through with the purchase.

It is undisputed that Ram's Gate understood the property was in an Alquist-Priolo Earthquake Fault Zone. What, if anything, it knew about the existence of active fault traces on the property when it purchased the winery is at the heart of this case. When due diligence resumed in the Fall of 2006, Roche and Davenport did not believe it was necessary to produce the same documents they had given to Hardy in 2005, since both transactions were handled by Hardy, the purchasing entity had the same name it had carried in 2005, two of the members were the same, and Hardy still had not returned the original documents Roche had produced in 2005.

Among the documents produced by Roche during the 2006 due diligence period, however, were the Giblin Report and the HLA Proposal. The HLA Proposal noted there were "active fault traces in the vicinity of the existing winery buildings" and cautioned that "[i]n the event fault traces are determined to underlie the building site it may be necessary to consider moving or reconfiguring the building to avoid encroachment into the area of potential fault rupture." Prior to building any new structures on the building pad, HLA advised that Sonoma County would require "an investigation" to "be performed to satisfy the requirements of the [Alquist-Priolo Earthquake Fault Zoning Act]."

Roche's attorney, Davenport, sent those documents to Hardy via email on November 20, 2006. Hardy then forwarded all of the documents to the members of Ram's Gate (John, O'Neill and Hansen) and discussed the documents with his clients in an "Update" email dated November 27, 2006, specifically advising his clients as follows: "Please note that the engineer

14

expressly advises that additional engineering may be required before construction. My recommendation is that we contact the engineers (Giblin & Associates) if you need or want any additional insights into the present condition." There is no evidence that Ram's Gate took any further action in response before escrow closed.

The sale of the winery closed on December 14, 2006, with the purchasers taking title in the name JHP Land, LLC. Shortly after the closing, Ram's Gate started preparations for construction of a new winery building and learned from a planning consultant, allegedly for the first time, it could not build on the building pad without further seismic study. It turned out such a study would be expensive because there was a great deal of fill dirt under or around the building pad that would have to be trenched through to conduct the seismic investigation. As a result, Ram's Gate decided to renovate the existing winery building rather than build on the pad.

The chosen site for the proposed new, renovated winery was in roughly the same place as the existing Roche winery, on top of a prominent four-acre knoll in the central portion of the property. In the course of the planning process for the project, Ram's Gate incurred a cost of some $127,000 to do the required seismic hazard study.[9] The study was undertaken in the summer of 2008, when O'Neill commissioned a consulting geologist, RGH Consultants, Inc. (RGH), to provide "geologic information regarding the possible presence or absence of active trace(s) of the Rodgers Creek fault" in connection with permitting of the renovation project (the RGH Report).

---

[9] Whether this was additional cost, over and above what JHP Land II would have spent if Roche had, in fact, completed the seismic hazard study that HLA proposed in 1997, or whether a new seismic hazard study was always going to be necessary for any construction of a structure on the building pad following Ram's Gate's acquisition of the winery, is disputed.

RGH, like Boudreau, started with the work by the CDMG in 1982, appending to its report, as Boudreau did, a map showing the active fault traces delineated by Hart. RGH, like Boudreau, dug exploratory trenches near the proposed winery building. "During our study," RGH reported, "we observed evidence of an active, northwesterly-trending fault to the Northeast of Roche Winery. The observed fault appears to coincide with the location of the fault found by Boudreau (1987)." Like Boudreau, and Hart before him, RGH concluded that this active fault was likely one of several active faults near the winery.[10]

Sometime around April of 2008, Ram's Gate consulted attorney Thomas Hyde, apparently in connection with an effort to deal with water rights under the lease-back arrangement Ram's Gate had with Roche in the year following the sale, but later, after Ram's Gate received the RGH Report, to investigate the adequacy of Roche's pre-sale disclosures. Hyde, in representing Ram's Gate, asked Hardy for his client files for both JHP Land I and JHP Land II, telling Hardy his clients were investigating "saltwater intrusion" and making no mention of seismic issues. With O'Neill's permission, Hardy provided his files to Hyde. And among those files was the Boudreau Report.

In September 2008, apparently unaware that the fault trace findings by RGH had been previously reported by Boudreau (which a close read of the RGH Report would have revealed), or that his own lawyer and broker, Hardy, may have had possession of the Boudreau Report in November 2006 but

---

[10] RGH Consultants, Inc. (August 20, 2008) Alquist Priolo Fault Hazard Study: New Carneros Winery 27665 Arnold Drive, Sonoma, California, page 30 ("Because this fault appears to be a discontinuous strand across the knoll, it appears to be a secondary fault. The main trace of the Rodgers Creek Fault, juxtaposing the Petaluma formation against Sonoma volcanics, is judged to be further northeast on the side of the knoll.").

never told him about it, O'Neill briefed his partners by memo on his renegotiation strategy with the Roches, as follows: "Over the next month, I will renegotiate the lease with the Roche family for the use of the property through 2008. It is my opinion that we can modestly enhance the revenue associated with this lease, but more importantly we want to keep the Roche family on our side while we apply for new plans, permits and a potential need for additional water. While we have not played our card regarding the fault line, we can, if necessary in the future."

Ram's Gate played that "card" two years later.

## B. *Ram's Gate's Action Against the Roches*

On October 12, 2010, Ram's Gate filed a lawsuit against Joseph and Genevieve Roche, Catherine Somple, the selling broker, and its own lawyer, Lester Hardy. The suit alleged fraud and negligent nondisclosure against the Roches and Somple, in addition to breach of contract against the Roches. Against Hardy, it alleged professional negligence and breach of fiduciary duty. The assigned trial judge was Judge Elliot Daum.

The operative first amended complaint alleging these causes of action was filed February 14, 2011. The negligent nondisclosure and breach of contract causes of action were based in large part on Roche's alleged failure to disclose seismic information showing an active fault trace near the winery building, premised in large part on Roche's alleged failure to disclose the Boudreau Report (referred to in the first amended complaint as the "1987 soils report") and the Conforti site plan.

In support of all of these causes of action, Ram's Gate also included allegations of affirmative misrepresentations, including principally the statement in the Offering Memorandum that "You can literally start building on [the building pad] w/ no ground work."

17

### 1. Initial Withholding of Documents by Ram's Gate

After launching its suit, Ram's Gate immediately began taking a series of shifting discovery positions designed to justify not producing documents that would allow Roche to prove the Boudreau Report had been in Hardy's hands all along.[11]

At the outset of discovery, Roche requested, among other things, "all . . . communications between [Ram's Gate] and Defendant Lester Hardy" which "related to this action" or to the Roche Winery. In response, Ram's Gate produced only 524 pages of documents—not including the 2005 Due Diligence Binder or any communications about its contents. There was no objection on the ground that Hardy's communications had been with JHP Land I, not Ram's Gate.

Rather, Ram's Gate tried to shield any communications with Hardy by asserting attorney-client privilege. Ultimately, ruling on a motion to compel production of documents in February 2012, Judge Daum overruled this objection for two primary reasons: first, Hardy was acting as a broker as well as a lawyer and many communications were not intended to be confidential, and second, Ram's Gate waived the attorney-client privilege by suing Hardy.

Judge Daum ordered Ram's Gate to provide "complete responses" to Roche's document requests "without withholding documents under the attorney-client privilege," and required Ram's Gate to produce a "privilege log" of documents withheld for *any* reason. Ram's Gate did none of these

---

[11] As a source of proof, Roche was dependent on documents produced in discovery, because JHP Land I and Hardy never returned the originals of the due diligence material he provided in connection with the aborted 2005 transaction, and because his own copies of emails and other documents had been destroyed when his attorney's computer crashed.

things. Its new tack was to deal with the waiver issue by dismissing Hardy, suing him separately, and reasserting attorney-client privilege.

## 2. First Motion for Sanctions

Because, months later, Ram's Gate was still ignoring the prior order to produce a log of anything still being withheld, in April 2012 Roche made a motion for sanctions, requesting not only a monetary sanction but the ultimate sanction of termination. Shortly before the hearing, Ram's Gate filed an amended supplemental response to the document request, claiming that "after conducting a diligent search," "all [responsive] documents [Ram's Gate] has received from Mr. Hardy . . . have already been produced."

Faced with Ram's Gate's repeated flouting of orders compelling production, the tentative ruling was to grant the requested terminating sanction. There is no doubt Judge Daum was inclined to view Ram's Gate's conduct as beyond the pale. "Although terminating sanctions are severe," his tentative ruling explained, "Plaintiff's actions have been misleading, and constitute an abuse of the discovery process. Further, Plaintiff's refusal to turn over the requested documents constitutes a blatant refusal to abide by the Court's order. There can be little doubt that documents have been withheld. As a result, Defendants' [*sic*] have been deprived of an opportunity to prosecute this case and defend themselves."

Judge Daum's final order of June 12, 2012, granting sanctions was just as scathing in its tone of reproval. "Plaintiff has completely ignored the order of the court," he found. "Instead of producing documents or supplemental responses, plaintiff has simply provided amended responses reasserting the same privilege" and seemed to believe that simply dismissing its lawyer, Hardy, somehow "obviated the necessity . . . to comply with the court's order of February 9, 2012." Ultimately, however, Judge Daum gave Ram's Gate a reprieve, deciding not to enter a terminating sanction "at this time,"

19

awarding a $2,500 monetary sanction, inviting an in limine motion for issue sanctions at trial, and once again ordering compelled production.

Although proof that Ram's Gate was still being deceptive had yet to surface—and would not come to light for nearly four years—it is evident that Judge Daum suspected he was being misled, and his sanctions order said so in plain terms. "The declaration of [Ram's Gate's] counsel makes no reference to review of any documents, withheld or otherwise," the order pointed out. "There is no explanation for how countless representations were made to this court and to the parties about the existence of the documents that had been withheld."[12]

### 3. Continued Withholding of Documents by Ram's Gate

Despite having been admonished for making representations that it was not withholding discoverable documents (while it was doing just that based on an unsustainable privilege objection), the pattern of dissembling by Ram's Gate immediately resumed. Within a day of Judge Daum's sanctions order issuing, on June 13, 2012—the day before Hardy's deposition was scheduled—Ram's Gate produced an additional 673 pages of documents, including 62 emails among the Ram's Gate principals, Hardy, Davenport, and the Roches. And once again, Ram's Gate claimed it had produced all responsive documents, including all communications with Hardy.

---

[12] Following entry of this sanctions order in June 2012, Hyde remained counsel of record for Ram's Gate but ceded the lead role in handling discovery on a going-forward basis to co-counsel, William Paynter, who appeared for Ram's Gate by association of counsel on June 6, 2012. With Paynter in charge of discovery, nothing changed. Ram's Gate continued to follow the course Hyde had set from the beginning, withholding the Boudreau Report for unspecified reasons while continuing to claim that all responsive documents had been produced.

As it turns out, many more discoverable emails among the Ram's Gate principals and Hardy were still being withheld. The existence of some of these additional documents came to light on February 5, 2013, when Hardy produced a CD containing 2,316 pages of documents, consisting almost entirely of communications between himself and Ram's Gate's members, a document production Hardy made despite Hyde's request that he not do so. Around the same time, Roche served a second set of document requests, again seeking any documents concerning earthquake faults on the property and Ram's Gate's communications with Hardy.

Ram's Gate responded to Roche's second set of document requests on February 13, 2013, by claiming it would make all such documents available at Ram's Gate's place of business. That, too, was revealed to be inaccurate at the deposition of John, which took place with a summary judgment motion by Roche pending. The John deposition commenced on February 21, 2013. He testified that he made "no attempt" to search for documents responsive to the document requests contained in his deposition notice. Although John testified he had "no documents" because he gave them all to O'Neill after the winery property was acquired, it was soon evident that John possessed emails and other documents that had never previously been produced.

John agreed at his deposition to search for discoverable documents and provide all email communication with his co-investors and with Hardy, but before any further production of documents based on that search could be made, on March 1, 2013, Judge Daum issued a ruling on the pending summary judgment motion. At this point, a trial date was set for March 22, 2013, only weeks away. Just days prior to trial, Ram's Gate produced a CD containing over 17,000 of John's emails, many of which included attachments. This eleventh hour production consisted of approximately

60,000 pages, and was produced too late for Roche to use in connection with the already-decided summary judgment motion.

## 4. Summary Adjudication Ruling and First Appeal

In December 2012, Roche filed a motion for summary judgment or in the alternative for summary adjudication. The motion was two-pronged.

First, Roche attacked the fraud and negligent misrepresentation claims on grounds that (1) Hardy admitted knowing in 2005 that the winery was in the Alquist-Priolo Earthquake Fault Zone due to its proximity to the Rodgers Creek Fault and, since his knowledge was imputed to his client under agency principles, Ram's Gate could not have relied on Roche's alleged failure to disclose seismic information when Ram's Gate purchased the winery, and (2) because Ram's Gate had actual notice of any injury to it when it learned of the possible existence of an active trace fault on the property in early 2007, these claims were tardy under the applicable statute of limitations.

Second, Roche attacked the breach of contract claim because, (1) under the doctrine of merger by deed, the allegedly breached disclosure warranties in the PSA did not survive the closing of the transaction, leaving Ram's Gate solely with the remedy of rescission if it could prove fraud, and (2) because Ram's Gate had a full opportunity to conduct due diligence prior to the purchase, and because at most all it could show had it received the allegedly withheld information is that it would have terminated the sale (which its failure to sue for rescission shows it would not have done), Ram's Gate received the "benefit of its bargain" and could not prove damages.

Roche's summary judgment motion met with mixed success. At that procedural juncture in the case, Roche contends, because he had no proof Hardy or Ram's Gate ever had possession of the Boudreau Report, he made no attempt to attack any of the claims against him on the ground that Ram's Gate knew, actually or constructively, that there were active fault traces in

22

the vicinity of the winery building at the time of the sale. Ruling on a record that made no mention of Hardy's or his client's possession of the Boudreau Report, since all Roche knew then was that a publicly available copy of the Boudreau Report was in the PRMD files, Judge Daum granted summary adjudication to Roche on the breach of contract cause of action based on the merger by deed doctrine, but denied summary adjudication as to the tort claims.

To facilitate an appeal following entry of the summary adjudication order, Ram's Gate voluntarily dismissed the tort causes of action without prejudice. For the appeal, Ram's Gate retained an appellate team from Arnold & Porter Kaye Scholer, LLP. In April 2015, a panel of this division reversed the summary adjudication for Roche, allowing the breach of contract cause of action to proceed in the trial court, and holding the doctrine of merger by deed did not preclude Ram's Gate from asserting the Roches' failure to abide by disclosure requirements in the PSA. (*Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1079–1083.) Following its successful appeal, Ram's Gate returned to superior court, where it continued to be represented by Arnold & Porter, with newly assigned trial counsel, Jonathan Hughes, pursuing solely the breach of contract claim that had been reinstated on appeal. Discovery resumed after remand.

## 5. Second Motion for Sanctions and Dismissal of the Action

Trial was scheduled for April 15, 2016. Ten days before trial, Roche's counsel, Simon, took O'Neill's deposition as the person most qualified (PMQ) to respond for Ram's Gate. (Code Civ. Proc., § 2025.230.) On the morning of the deposition, Hughes emailed Simon that his office had learned of a "binder of materials" consisting of "Hardy's documents from the 2005 transaction" which had been in Hyde's possession. "My understanding," Hughes wrote, "is that the binder had not been previously produced and we are producing it

23

today." What he produced was the 2005 Due Diligence Binder, and in it was the Boudreau Report—which amounted to a "smoking gun," as the course of events in the case would shortly reveal.[13]

Confronted at his PMQ deposition with this new evidence, O'Neill admitted that: (1) Ram's Gate's agent Hardy had the Boudreau Report in his possession before close of escrow; (2) the Boudreau Report provided "much more detail" about active earthquake faults than the Conforti site plan; (3) there was no additional information, outside of what was contained in the Boudreau Report, that O'Neill could identify as something Roche should have disclosed; and (4) after five and a half years of accusing Roche of having fraudulently concealed the Boudreau Report and the Conforti site plan,

---

[13] Though they are careful to avoid highlighting it, the Ram's Gate defendants and Hyde take different positions on whether the 2005 Due Diligence Binder should have been produced in discovery.

Obviously, Ram's Gate now believes it should have been, because, on Hughes's counsel, that is what happened. About this, in their opening brief on appeal, the Ram's Gate defendants simply say Ram's Gate "had stated incorrectly that it had produced all documents responsive to Roche's requests for production"; that "[a]mong the unproduced documents was a binder that Hardy appears to have possessed at the time of the winery purchase"; that the binder included a copy of the Boudreau Report; and that, because the binder's production was called for by a notice to produce documents in connection with O'Neill's April 2016 deposition, it was produced at that time.

Hyde, on the other hand, takes the position that no JHP Land I client files should have been produced, at any time. He chalks up the need to produce these files as having been based on a privilege waiver due to "inadvertent" production of some of them by Hardy in March 2013. Without directly taking a position on the judgment Hughes made to produce JHP Land I client files—including the Boudreau Report—at O'Neill's April 2016 deposition, Hyde contends it was unethical for Hardy to produce any JHP Land I client files without the consent of the client. And at that point, Hyde argues, since JHP Land I had been dissolved, the "client" was John, who in his view was the holder of former JHP Land I's attorney-client privilege.

O'Neill could no longer stand behind that charge. When asked if he knew with certainty whether the Boudreau Report and the Conforti site plan had or had not been disclosed, O'Neill replied, "No, we don't know that definitively."[14]

Two days later, Roche again moved for sanctions, again seeking monetary and terminating sanctions based on Ram's Gate's continued pattern of deliberately withholding discoverable documents—most crucially, the 2005 Due Diligence Binder and the Boudreau Report. Instead of allowing the motion to come on for a ruling, O'Neill, as manager of Ram's Gate, decided to pull the plug on the case. The next day the parties agreed that Ram's Gate would dismiss the underlying action and pay Roche $600,000 in attorney fees and costs. A stipulated judgment was entered on April 13, 2016.

## C. *Roche's Malicious Prosecution Action*

In July 2016, Roche filed a malicious prosecution action against Ram's Gate, John, O'Neill and Hyde, seeking compensatory and punitive damages totaling upwards of $5 million.[15] The gist of the complaint is that Roche had

---

[14] In its rehearing petition, Ram's Gate, citing nothing but an assertion put forward in its reply brief, tries to back away from this concession, claiming, "O'Neill testified he was certain that neither document [the Boudreau Report nor the Conforti site plan] was disclosed to him but could not testify from personal knowledge as to what was disclosed or not to others." The deposition transcript does not bear this out. Right after conceding that "*we* don't know that definitively," O'Neill—who was appearing for deposition as Ram's Gate's PMQ designee, not in his personal capacity— was asked, "And you are the person most qualified on behalf of Ram's Gate Winery to testify about what was and what was not disclosed during escrow, correct?" To which he answered unequivocally "Correct." (Deposition of Jeffrey O'Neill (O'Neill Deposition) (April 5, 2016) at p. 134, italics added.)

[15] Hansen at some point severed ties with Ram's Gate and had no involvement in the underlying action. He is not a party to this litigation.

disclosed to the defendants all the information required by the PSA prior to the close of escrow, so that the underlying action prosecuted against Roche was brought without probable cause and with malice. Roche alleged the defendants were trying to "shake down a 72-year-old man . . . for millions of dollars" in spite of knowing their accusations were false.[16] The assigned trial judge was Judge René Auguste Chouteau.

Roche claimed the defendants already had knowledge of the seismic condition of the property and could not have relied on any alleged nondisclosures because Ram's Gate's attorneys had in their files the Boudreau Report, which disclosed active fault traces near the winery building. With respect to the two-acre building pad, Roche contended the alleged misstatements in the Offering Memorandum about the viability of building on it without further approvals could not have induced Ram's Gate's justifiable reliance because the HLA Proposal, emailed to John and O'Neill before the close of escrow, disclosed the need to perform further seismic testing before building on the pad.

The Ram's Gate defendants filed an anti-SLAPP motion under Code of Civil Procedure section 425.16, and Hyde filed a separate motion on the same grounds. The motions were denied. The Ram's Gate defendants and Hyde filed separate appeals, and we consolidated the two cases for all purposes in this court. We filed an unpublished opinion in August 2019 affirming Judge Chouteau's denial of the anti-SLAPP motions, and Ram's Gate and Hyde timely sought rehearing. We also received two requests for publication, one

---

[16] Although the first amended complaint in the underlying action specified damages of only $127,403.79, Roche alleges in his malicious prosecution complaint, and in his declaration, that Ram's Gate demanded $5 million to settle the matter in early settlement talks. Hyde denies making such a demand.

from the Consumer Attorneys of California and one from attorney Steven B. Piser, both citing rule 8.1105(c)(3), (4), (6), (7) and (8) of the California Rules of Court. Piser, a 45-year solo practitioner specializing in legal malpractice and other kinds of complex business litigation, points out a trend toward "declin[ing] . . . civility in our profession [that] . . . often manifests itself in discovery stonewalling, withholding of evidence and misrepresentations by counsel to the court and opposing parties."

According to Piser's publication request, "only if appellate and trial courts vigorously—and publicly—enforce the rules and impose consequences for their violation will there be any hope for change." He contends that our opinion addresses in a well-reasoned way "an all too frequently occurring— yet infrequently addressed—set of circumstances confronting trial lawyers and litigators." He sees in it a "strong message" that "should not be buried in the land of unpublished non-citable, decisions[, for it provides] . . . a lesson to attorneys about the ethical, practical and predictable outcomes of flouting the rules and engaging in win at any cost tactics."

With revisions to address several aspects of the rehearing petitions we found to merit additional discussion or modification, we now re-file our opinion as modified and certify the opinion for publication.

### III. DISCUSSION

#### A. *The Law*

##### 1. **Anti-SLAPP Principles**

The anti-SLAPP statute requires a two-step analysis. First, the defendant must establish that the challenged claim arises from his or her act in furtherance of the " 'right of petition or free speech under the [federal or state] Constitution in connection with a public issue . . . .' (§ 425.16, subd. (b)(1).) 'The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It

27

only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.' " (*Sweetwater, supra,* 6 Cal.5th at p. 940.) " 'If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' " (*Ibid.*)

"We review the trial court's rulings on an anti-SLAPP motion de novo, conducting an independent review of the entire record." (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 212.) In exercising our independent judgment, we "may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater, supra*, 6 Cal.5th at p. 949; Code Civ. Proc., § 425.16, subd. (b)(2) [we consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based"].) And we "must draw 'every legitimate favorable inference' from the [anti-SLAPP] plaintiff's evidence." (*Cuevas-Martinez, supra*, 35 Cal.App.5th at p. 1117; *HMS Capital*, *supra*, at p. 212.)

## 2. Malicious Prosecution

A cause of action for malicious prosecution fits by definition into the scope of the anti-SLAPP statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734–735.) Hence, the first step of the analysis is satisfied, and we proceed to the second step. The issue there is whether Roche

28

provided sufficient evidence to make out a prima facie case of malicious prosecution, which requires a plaintiff to establish three elements: the underlying action was (1) initiated or maintained by, or at the direction of, the defendants, and pursued to a legal termination in favor of the malicious prosecution plaintiff; (2) initiated or maintained without probable cause; and (3) initiated or maintained with malice. (*Parrish*, *supra*, 3 Cal.5th at p. 775; *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965–966.)

## B. *Favorable Termination*

### 1. We Evaluate Favorable Termination Based on the Entire Action and the Surrounding Circumstances of the Dismissal

In its opening brief, Ram's Gate contends Roche cannot show the claims against him were terminated in his favor. It suggests Roche was required to show that he prevailed upon each of the causes of action asserted against him. But as Ram's Gate concedes in reply, under *Crowley v. Katleman* (1994) 8 Cal.4th 666, holding to the contrary, it is the action as a whole that must have terminated favorably (*id.* at pp. 684–685). Thus, we need not decide whether the voluntary dismissal of the tort claims following summary adjudication of the contract claim constituted a favorable termination of those causes of action; only the final judgment following Ram's Gate's agreement to pay $600,000 of Roche's attorney fees need be examined to decide whether it was a favorable termination for Roche.

"A ' "favorable" termination does not occur merely because a party complained against has prevailed in an underlying action. While the fact he has prevailed is an ingredient of a favorable termination, such termination must further reflect on his innocence of the alleged wrongful conduct. If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious

29

prosecution.' [Citation.] ' "[W]hen the underlying action is terminated in some manner other than by a judgment on the merits, the court examines the record 'to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed.' " [Citations.]' [Citation.] 'Should a conflict arise as to the circumstances of the termination, the determination of the reasons underlying the dismissal is a question of fact. [Citation.]' " (*Sycamore Ridge, supra,* 157 Cal.App.4th at p. 1399.)

The relevant circumstances here are these. After O'Neill's PMQ deposition on April 5, 2016, and facing Roche's motion for monetary and terminating sanctions, Ram's Gate decided to dismiss the underlying action. On Friday, April 8 at 5:06 p.m., Hughes, on behalf of Ram's Gate, emailed Simon that Ram's Gate would dismiss the action and pay Roche $500,000 in fees and costs. Simon responded at 5:15 p.m. that Roche, 76 years old at the time, was emotionally exhausted from the litigation and did not want any further "back and forth." Simon extended Roche's counteroffer of $600,000 in fees and costs, with the dismissal, requesting a response by 5:30 p.m.

Roche's actual fees and costs amounted to more than $725,000, but there is no evidence a precise figure had been calculated at the time the agreement was reached. The written counteroffer specifically says Roche and his attorney "do not consider this a settlement." Simon put Ram's Gate on notice that Roche retained his right to initiate a separate malicious prosecution action later. At 5:31 p.m., Hughes responded by email, expressing the belief that a malicious prosecution action would not succeed, but nevertheless agreeing to Roche's terms.

Ram's Gate dismissed the underlying action the following Monday, April 11. And on April 12, the parties entered into a stipulation for entry of judgment, which said in part: "It is intended that the judgment would

30

preclude Roche from seeking additional costs or fees in this case, without waiving the right to seek them in a different action." Also, "[t]he parties do not intend to release or waive or otherwise interfere with any claims they may have, including, without limitation, any claim for malicious prosecution arising out of this action." The next day a "judgment for costs and fees" was entered, identifying Roche as the prevailing party and noting his entitlement to fees and costs under the PSA.

## 2. The Unilateral Dismissal by Ram's Gate Is Presumptively a Favorable Termination for Roche

The unilateral dismissal of a cause of action (except on technical or procedural grounds) is presumed to be a favorable termination on the merits unless otherwise proved to a jury. (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1400.) "[T]he circumstances surrounding the dismissal of an underlying case for discovery abuse may justify a conclusion that a favorable termination on the merits occurred." (*Daniels*, *supra*, 182 Cal.App.4th at p. 217 [dismissal entered as terminating sanction was a favorable termination for defendant]; *Ross v. Kish* (2006) 145 Cal.App.4th 188, 192 [dismissal for plaintiff's refusal to be deposed was a favorable termination for defendant].) The same outcome is called for here, where Ram's Gate unilaterally decided to dismiss the underlying action rather than face a sanctions motion that almost certainly would have resulted in termination of the action and even greater financial liability.

While the stipulated dismissal may appear in form to effectuate a settlement, as signatures on behalf of both parties appear, we view it in substance as a unilateral dismissal. The defendants argue the dismissal was pursuant to a negotiated settlement and was not a termination favorable to Roche. (See *Ferreira v. Gray, Cary, Ware & Friedenrich* (2001) 87 Cal.App.4th 409, 413 (*Ferreira*); *Ludwig v. Superior Court* (1995)

31

37 Cal.App.4th 8, 27 (*Ludwig*); *Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335 (*Villa*).)  It is true that where a case is dismissed pursuant to a give-and-take settlement, it "will not be viewed as a favorable termination as long as [the dismissal] was a necessary condition to achievement of the overall settlement." (*Villa*, at p. 1336.)  That is because a dismissal pursuant to a settlement " 'reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence.' " (*Ibid.*; see also *Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 743–744 (*Siebel*).)

But the Supreme Court has cautioned against an unyielding rule that would make any resolution of a case by agreement ineligible as a basis for a subsequent malicious prosecution action.  (*Siebel*, *supra*, 41 Cal.4th at pp. 742–743.)  "Such a conclusion would run counter to the policy favoring negotiated dispositions.  A blanket rule could also bar legitimate malicious prosecution actions, allowing unscrupulous parties and/or their attorneys to hide behind its shield." (*Ibid.*)  In *Siebel*, the court held an agreement by the parties to dismiss their appeals, without altering the underlying favorable judgment for Siebel, did not foreclose his later malicious prosecution action. (*Id.* at pp. 742–745.)  The underlying substance and effect of an agreed dismissal—not its form—was the determining factor there, as it is here.

### 3. In Light of the Circumstances of the Dismissal, Defendants Have Not Overcome the Presumption of Termination Favorable to Roche

Ram's Gate acknowledges that a dismissal unaccompanied by a settlement can be a favorable termination, but argues that under the holding in *Siebel*, *supra*, 41 Cal.4th 735, the issue of favorable termination turns on whether there has been an adjudication for the malicious prosecution plaintiff followed by a quid pro quo settlement in the underlying case.  As

counsel for Ram's Gate put it at oral argument, in *Siebel*—where the malicious prosecution plaintiff largely prevailed in a jury trial, secured a judgment, and then settled on appeal—"the key is . . . that there is an adjudication. There's a subsequent settlement. And the subsequent settlement doesn't disturb the adjudication." Where there has been a settlement, Ram's Gate argues, no case has ever found a favorable termination without a prior adjudication of some kind, and as a result, it would be a "major change" in the law to find for Roche on this record.

We do not think so. Ram's Gate's position begs the question of whether there was an agreement on anything that can fairly be called a "settlement." If the record clearly discloses the terms of an overall compromise of claims requiring dismissal as a condition, such a rule makes sense. (*See Villa, supra,* 4 Cal.App.4th at p. 1336 ["[D]ismissal from the lawsuit pursuant to . . . settlement will not be viewed as a favorable termination as long as it was a necessary condition to achievement of the overall settlement. Such a dismissal is not considered unilateral because it was required by the terms of a settlement agreement[.]"].) But in the absence of a written settlement agreement compromising specified claims, we must assess the circumstances surrounding a pretrial dismissal to discern the terms that were agreed upon, if any. The object, in the end, as it is with any issue of contract formation or contract interpretation, is to examine the parties' words, actions and conduct to determine whether there is a mutual intent to dismiss, as Ram's Gate puts it, as "part . . . of a settlement agreement that was conditioned on each side giving something to the other."

Roche's proof shows that there was no such agreement here. Drawing inferences in his favor, as we must at this stage, the record leaves little doubt that Ram's Gate unilaterally decided to dismiss this action prior to trial

33

independently of the parties' agreement on fees. In the face of a second request for terminating sanctions (something it had narrowly averted once before), Ram's Gate made an uninvited, unilateral offer to dismiss the underlying action. Gone was any demand for payment from Roche. Ram's Gate offered, instead, to pay $500,000 in fees to Roche, and then when that offer was rejected, immediately met Roche's demand for $600,000 without obtaining a release of claims.[17] Ram's Gate portrays the dismissal as part of a "package" of proposed terms, pointing out that its original offer to dismiss was expressly contingent on the parties agreeing to an amount of fees payable to Roche. But that original offer was rejected by counteroffer, and it is beside the point in any event because the negotiations centered on the collateral issue of Ram's Gate's fee exposure—for which it received no protection—not on a compromise of its claims. If Ram's Gate's post hoc version of agreed terms was indeed the parties' shared intent, the way to proceed was to write it down and have the document mutually executed.

On the record presented here, we conclude Roche has met his prima facie burden of showing that the dismissal of this action does not reflect a

---

[17] In his rehearing petition, Hyde argues "there is no requirement that a settlement agreement contain release language or other terms related to liability." While that may be literally true—there is no *requirement* that a settlement agreement, as a contract, must contain particular language—any lawyer who prepares a settlement agreement without protecting his or her client against future claims by release is inviting malpractice risk. (See 4 Mallen, Legal Malpractice (2019 ed.) Drafting the settlement documents, § 33.103.) Arguably, a release is unnecessary in cases involving settlement by stipulated judgment (Code Civ. Proc., § 664.6; *cf. Villa, supra,* 4 Cal.App.4th at p. 1333 [stipulation to dismissal with prejudice in federal court])—which is not the situation we have here—but even in that setting there may be some risk to omitting "release language or other terms related to liability" that defines the scope of the claims being resolved and thus the preclusive effect of the judgment.

compromise driven by uncertainty over the merits of Ram's Gate's claims. As we see things, an outcome unfavorable to Ram's Gate was sealed by its own conduct in discovery, and the only remaining issue when Hughes approached Simon to discuss terms was whether anything could be done to minimize its exposure to attorney fees. In light of the parties' actions, the expense-saving "discount" that was offered cannot fairly be called a compromise of claims. Especially when the circumstances are viewed in light of O'Neill's declaration explaining Ram's Gate's decision to fold,[18] and the pressure Ram's Gate was under at the time, the inference is unavoidable that the decision to abandon the litigation was made independently of how much Ram's Gate would pay Roche for his legal fees.

O'Neill's declaration states that he decided "we would not continue with the litigation" after discussing the pending sanctions motion with Hughes. He says he decided to dismiss the action in large part because he feared a worse result if the case went forward, in light of the pending motion for monetary and terminating sanctions and because, even if the case went to trial, "a jury could be critical" of Hyde's handling of the Boudreau Report and hold that against Ram's Gate. O'Neill had in mind the fee-shifting provision of the PSA and was obviously concerned about potentially having to pay the full measure of Roche's fees and costs. He was particularly concerned about having sanctions imposed by the court because he "knew the court previously had been very frustrated with Hyde's handling of discovery and had almost terminated the case in 2012.[]"

---

[18] Declaration of Jeffrey B. O'Neill in Support of Defendant Ram's Gate Winery, LLC et al.'s Special Motion to Strike Plaintiff Joseph G. Roche's Complaint (Sept. 5, 2016) (O'Neill Declaration) at page 10.

Ram's Gate complains that any reliance on O'Neill's declaration runs contrary to cases holding "[i]t is not necessary to analyze the particular circumstances of the settlement or to examine the motivations of the parties" to decide the issue of favorable termination. (*Ferreira, supra,* 87 Cal.App.4th at p. 414; *Ludwig, supra,* 37 Cal.App.4th at p. 28.) But in *Ferreira* and *Ludwig* the evidence was clear enough to show negotiated terms referring to and resolving claims on the merits and specifying in detail the obligations undertaken and the concessions made by each side as part of an overall compromise of those claims.[19] There is no such evidence here. The significance of O'Neill's declaration is not that it impeaches the purpose of a

---

[19] *See Ferreira*, *supra*, 87 Cal.App.4th at page 412 ("[T]he parties agreed to settle the litigation on the following terms: (1) notwithstanding the jury's verdict [against Ferreira on Maryanne's wiretapping and infliction of emotional distress claims], judgment would be entered in favor of Ferreira on [these claims] . . . ; (2) judgment would be entered in accordance with the remainder of the verdict, including the award of $75,982 in damages to Ferreira; (3) Ferreira would accept $1 each from Debra, Christine and Maryanne in full satisfaction of this judgment and file a satisfaction of judgment forthwith; and (4) Debra, Christine and Maryanne would not pursue an appeal of the judgment. As a result of this agreement, an amended judgment was entered on November 24, 1997, and on December 2, 1997, Ferreira filed an acknowledgment of satisfaction of judgment."); *Ludwig, supra*, 37 Cal.App.4th at page 12 ("Sheree Krier . . . filed an action under the California Environmental Quality Act (CEQA) [the Keating lawsuit] challenging Barstow's adoption of a negative declaration for the Tanger project. Krier later dismissed the action in return for the payment by Barstow of at least $75,000; Barstow, as part of the settlement, asserted that Krier's claims had no merit and had been brought for harassment purposes. [¶] The record as later developed indicates that the Keating lawsuit was dismissed with a mutual cost waiver. . . . [¶] The Krier settlement obligated Barstow to prepare an 'updated Master Environmental Assessment' at a cost of at least $35,000 ($15,000 payable to a named 'environmental attorney' who happened to be Krier's attorney), to create an 'environmental advocacy fund' with a contribution of at least $30,000, evidently to go primarily to Krier or her attorney, and to pay her attorney fees of $10,000.").

settlement agreement—to compromise claims in the face of uncertainty about the outcome on the merits, an objective we generally presume in the case of a settlement of claims, without looking further into subjective motivation—but rather that it confirms there was never such a settlement in the first place. The position taken by Ram's Gate and Hyde in citing *Ferreira* and *Ludwig* skips over this critical, antecedent question.

In light of O'Neill's admitted concerns when he decided to walk away from the case and the circumstances leading to that decision, we view the parties' agreement with respect to the amount of attorney fees Ram's Gate would pay to Roche not as a settlement of claims on the merits, but as the resolution of an "ancillary" matter that does not foreclose a finding of favorable termination for Roche. (See *HMS Capital, supra*, 118 Cal.App.4th at pp. 215–216.) In *HMS Capital*, as here, the subject of what the appellant tried to characterize as a settlement was merely a reduction in the amount of costs claimed by the prevailing party. In that case, the Second District held this agreed reduction of costs payable was "ancillary" to the merits of the claim and did not foreclose a later action for malicious prosecution. (*Id.* at p. 215.)

The same reasoning applies here. The final chapter in the underlying case was a surrender, not a negotiated settlement. To say there was a negotiated settlement on this record is like saying the Civil War was "settled" because, after opting against a final blow on the battlefield at Appomattox, Ulysses S. Grant had Robert E. Lee's men stripped of their weaponry but allowed them to return home with their horses and mules, rather than suffer confiscation of everything they owned. Beyond that, he made no promises.

## C. *Lack of Probable Cause*

On the question whether there was probable cause to pursue the underlying action, we review the elements of each cause of action

37

individually.  (*Lanz v. Goldstone* (2015) 243 Cal.App.4th 441, 459.)  The decision on the probable cause element is normally made by the court as a matter of law based on an objective assessment of the merits of the underlying action.  (*Parrish*, *supra*, 3 Cal.5th at p. 776; *Sheldon Appel Co.*, *supra*, 47 Cal.3d at pp. 877–882.)  Our review is de novo.  (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 212.)

"[T]he probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable."  (*Sheldon Appel Co.*, *supra*, 47 Cal.3d at p. 878.)  A claim is unsupported by probable cause if any reasonable attorney would agree that it is totally and completely without merit.  (*Parrish*, *supra*, 3 Cal.5th at p. 776.)

The legal question of probable cause turns "not [on] the defendant's subjective belief in the legal tenability of his claim, but rather the state of the defendant's knowledge of the facts on which his claim was based."  (*Sheldon Appel Co.*, *supra*, 47 Cal.3d at p. 880.)  "The importance of the distinction between the defendant's knowledge of facts and his subjective assessment of tenability was made clear by Chief Justice Taft of the United States Supreme Court in explaining the nature of the probable cause element of the analogous tort of wrongful arrest:  'The want of probable cause . . . is measured by the state of the defendant's *knowledge,* not by his *intent.*  It means the absence of probable cause known to the defendant when he instituted the suit.  But the standard applied to defendant's consciousness is external to it.  The question is not whether *he* thought the facts to constitute probable cause, but whether *the court* thinks they did.' "  (*Id.* at p. 881.)

What this means is that, before the court reaches the ultimate issue of probable cause, there may be preliminary questions of fact to resolve. "When there is a dispute as to the state of the defendant's knowledge and the existence of probable cause turns on resolution of that dispute, . . . the jury must resolve the threshold question of the defendant's factual knowledge or belief. . . . As Chief Justice Taft's explanation of the probable cause element indicates, . . . the jury's factual inquiry into the defendant's belief or knowledge is not properly an inquiry into 'whether [the defendant] thought the facts to constitute probable cause' [citation]; when the state of the defendant's factual knowledge is resolved or undisputed, it is the court which decides whether such facts constitute probable cause or not." (*Sheldon Appel Co.*, *supra*, 47 Cal.3d at p. 881.)

Before turning to a de novo analysis of the record to evaluate the sufficiency of Roche's prima facie showing on the element of lack of probable cause, we emphasize that we are making no factual findings in the discussion to follow. That is not our task. All we are charged with doing here is to determine whether Roche has made the necessary prima facie showing of likelihood of success on the merits. Whether he can bear his burden of proof at trial remains to be seen.

1. **Roche Made Out a Prima Facie Case of Likelihood of Success that Ram's Gate Lacked Probable Cause To Sue**

While there are some preliminary questions of fact to resolve at trial concerning the defendants' belief or knowledge, at this stage inferences about these matters must be drawn for Roche. Upon examination of the evidence through that lens, we conclude that Roche has met his burden under Code of Civil Procedure section 425.16, subdivision (b)(1) of showing that Ram's Gate lacked probable cause to bring or maintain the underlying action. This is not a situation in which an attorney brought suit on thin evidence, hoping his

39

case would grow stronger in discovery, or on a novel legal theory, hoping the law would evolve in his favor, only to suffer a predictable defeat that he cannot be charged with a duty to predict. To the contrary, Roche has made a showing that Hyde had no objectively provable case at all, yet proceeded anyway.

The record here is complex, but the determinative issue is fairly straightforward. Ram's Gate's central charge against Roche was alleged failure to disclose the presence of an active fault trace near the winery site, an omission O'Neill claims misled him into believing a new winery could be constructed right away on the building pad Ghilotti had installed. Prior to the filing of the lawsuit, however, Hardy sent Hyde his JHP Land I client files, and those files included the 2005 Due Diligence Binder. Because the Boudreau Report was among the materials in the 2005 Due Diligence Binder, marked with a tab and clearly identified, Hyde knew it had been in Hardy's possession, and he knew it revealed the very information he was advising Ram's Gate to sue Roche for failing to disclose.

Judge Chouteau concluded that under agency principles Ram's Gate had constructive knowledge of the Boudreau Report and thus brought suit alleging failure to disclose information it was charged to know by law, and that Hyde either knew this or should have known it. In resolving the probable cause issue for Roche, he rejected Ram's Gate's attempt to rely on the interim adverse judgment rule, finding that "while Roche ultimately did not prevail on the 2013 motion for summary judgment or adjudication in the underlying action, this does not support a finding of probable cause because Roche was improperly denied responsive discovery by Ram's Gate et al. up to and long after the motion was decided and appealed."

40

For the reasons explained below, we agree on both counts. There is evidence—prima facie evidence to be sure, but strong enough to survive an anti-SLAPP motion—that Hyde likely knew, or at the least should have known, that Ram's Gate was aware of the Boudreau Report prior to the closing. O'Neill himself submitted a declaration acknowledging the existence of evidence that Hardy "obtained a copy of the Boudreau Report in 2005" and sent a copy of the "files he obtained" in the course of his preliminary due diligence in 2005 "to John's law office." And John testified in deposition that he turned over all documents "concerning the property" to O'Neill when O'Neill took the lead on due diligence in 2006.

O'Neill nevertheless insists that, in 2006, he personally had no actual knowledge of the existence of the Boudreau Report and first learned of its existence from the RGH Report in August 2008. John hedges a bit, but says he is "pretty sure" he never saw the Boudreau Report at any time prior to the closing. But even if we credit these claims of ignorance, we agree with Judge Chouteau that it makes no legal difference because the Ram's Gate defendants must be charged with knowledge of information in the hands of their own lawyers under principles of agency law.

Hyde argues he was entitled to rely on uncorroborated statements by his clients, citing *Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 626 and *Morrison v. Rudolph* (2002) 103 Cal.App.4th 506, 512–513 (both disapproved on other grounds in *Zamos v. Stroud*, *supra*, 32 Cal.4th at p. 973). But the rule is otherwise when, as here, the attorney possesses knowledge of *specific facts* directly calling into question the truth or legal substance of the client's claims or indicating that a fundamental element of his client's case is unmeritorious. (See *Sheldon Appel Co.*, *supra*, 47 Cal.3d at pp. 877–882; *Swat-Fame*, *supra*, 101 Cal.App.4th at p. 627; *Daniels*, *supra*,

41

182 Cal.App.4th at p. 223; *Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 156–157.)[20]

Against the weight of the evidence, Hyde disputes that Hardy ever had possession of the Boudreau Report, at any time.[21] But from whatever source

_____

[20] See also *Morrison v. Rudolph*, *supra*, 103 Cal.App.4th at page 513 (where attorney is "on notice of specific factual mistakes in the client's version of events"). In such circumstances, at least, " 'an attorney has a duty to investigate the facts underlying a client's claims and can be sanctioned for failing to do so.' " (*Takhar v. People ex rel. Feather River Air Quality Management Dist.* (2018) 27 Cal.App.5th 15, 29; see also *Cuevas-Martinez*, *supra*, 35 Cal.App.5th at p. 1121 [holding an attorney may rely on the client's assertions at the beginning of the case, but "may not continue to do so if the evidence developed through discovery indicates the allegations are unfounded or unreliable"].)

[21] The parties take a range of positions on the issue of whether Hardy had possession of the Boudreau Report, and if so, when he possessed it. Roche argues Hardy had possession of it in 2005 and 2006, because it was among the JHP Land I client files he sent to Hyde in 2008.

In the main briefs, Ram's Gate admits there is evidence of Hardy's possession of the Boudreau Report prior to the closing and assumes it arguendo, but contends that in 2005 Hardy never had any reason to review the 2005 Due Diligence Binder because of the narrow scope of his engagement. In its petition for rehearing, Ram's Gate emphasizes that it has never conceded the issue of Hardy's possession of the Boudreau Report in 2006 and states that "Hardy may not have even possessed" the 2005 Due Diligence Binder.

Throughout all of the briefing, Hyde has vigorously contested whether Hardy ever had possession of the Boudreau Report at any time. Effectively writing Hardy out of the picture by passive construction, Hyde claims "the Boudreau Report *was found* in a binder created in 2005 by Clement Fitzpatrick, a law firm which never represented Ram's Gate." (Italics added.) Who he means to suggest "found" it is not clear. He does suggest, however, that the Boudreau Report may, or may not, have been among a group of documents that Winter—who worked out of the Santa Rosa office of the Clement firm, separate from Hardy in St. Helena—copied from the PRMD files to support Hardy's investigation of permitting issues in 2005, but even if

Hardy received the document, there is evidence that Hardy, before close of escrow, and later Hyde himself, had possession of it. In fact, the evidence Hardy had possession of the Boudreau Report in 2005 was among the reasons O'Neill cited when he decided to dismiss the underlying case in April 2016. Exactly how Hardy came into possession of the Boudreau Report is disputed (*ante*, at pp. 11–12 & fn. 6), but we find it unnecessary to know the answer to that question. Because the evidence shows that Hardy had the Boudreau Report in 2005, his client at that point, John, then the managing member of JHP Land I, and later a member of JHP Land II, had constructive knowledge of the report during the disclosure period in 2006.

    a. *Under agency principles any information that was material to the closing of the transaction in 2006 must be imputed to Ram's Gate if it was in Hardy's possession, actually or constructively*

Under general agency principles, "an attorney is his client's agent, and . . . the agent's knowledge is imputed to the principal even where . . . the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact." (*Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 828; see also *Lazzarevich v. Lazzarevich* (1952) 39 Cal.2d 48, 50 ["[o]rdinarily a person is held to know what his attorney knows and should communicate to him"].) This rule of imputed notice is irrebuttable. (*Herman*, at p. 828; *Early v. Owens* (1930) 109 Cal.App. 489, 494; *Watson v. Sutro* (1890) 86 Cal. 500, 516–517, 523; see Civ. Code, § 2332 ["[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate

---

it was, he claims there is no evidence it ever made its way into Hardy's possession.

43

to the other"].)[22]  And it includes things the agent not only knows with regard to the subject matter of his agency, but by inquiry notice should know.  (*Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503, 527; Civ. Code, § 19 ["Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he or she might have learned that fact."].)[23]

The knowledge imputed from an attorney to his client extends beyond the individual attorney involved, to other attorneys in the same law firm working on the same engagement.  (*Stalberg v. Western Title Ins. Co.* (1991) 230 Cal.App.3d 1223, 1230–1231 [concluding law firm's knowledge of fact was imputed to clients].)  "[N]otice in regard to the subject-matter of the employment, to one of a number of attorneys employed by a client, is notice to the client."  (Annot., Imputation of Attorney's Knowledge of Facts to His Client (1919) 4 A.L.R. 1592, § VII [knowledge of partner or clerk of attorney].)  That means the knowledge of both Hardy and Winter may be imputed to

---

[22] See also Restatement Third of Agency, section 8.11, italics added ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent *knows, has reason to know, or should know* when  [¶] (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and  [¶] (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person.").

[23] Actual notice is "express information of a fact."  (Civ. Code, § 18, subd. 1.)  " 'Constructive notice is "the equivalent of *actual knowledge*; i.e., knowledge of its contents is conclusively presumed."  (4 Witkin, Summary of Cal. Law [(9th ed. 1987) Real Property], § 203, page 408, italics in original.)' "  (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1385 (*Alfaro*), quoting *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 355.)

their client in 2005, JHP Land I, and its members, including John.  The same rule of imputation applies to a limited partner (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 126–128), and by extension, to members of an LLC, which is relevant here because John was later a member of JHP Land II.  A contrary rule would permit a corporate entity, by "not letting its right hand know what is in its left hand, to mislead and deceive those who are dealing with it in perfectly good faith."  (*Sanders v. Magill* (1937) 9 Cal.2d 145, 154.)

To avoid any inference that the seismic information revealed by the Boudreau Report may be imputed to Ram's Gate in 2006, the defendants rely on the principle that client imputation is limited to information gained within the authorized scope of an agent's authority.  (*In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 439; *Zirbes v. Stratton* (1986) 187 Cal.App.3d 1407, 1413.)  They emphasize Hardy's deposition testimony that he had no recollection of reviewing anything in particular in the 2005 Due Diligence Binder; that he had no knowledge of whether any geological report had been submitted by Roche to permitting authorities; that in reviewing the PRMD permit files obtained by Winter, he did not look for soils reports or concern himself with seismic issues; and most importantly, that in the course of his preliminary due diligence assignment in 2005 he was specifically instructed to look only at permitting issues that would affect the financial viability of Ram's Gate's contemplated business model.

But what the defendants overlook with this emphasis on the narrowness of Hardy's engagement in 2005 and the haziness of his recollection is that he had a duty *in 2006* to know what was in the 2005 Due Diligence Binder, even if it was compiled for a limited purpose in the prior transaction.  (See Rest.3d Agency, § 8.08; see also Rules Prof. Conduct, rules 1.1 [Competence], 1.3 [Diligence], 1.4 [Communication with Clients].)  "The

45

general rule that a principal is bound by the knowledge of his agent is based on the principle of law, that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of the negotiation, and the presumption that he will perform that duty." (*Distilled Spirits* (1870) 78 U.S. 356, 367.) If, in 2006, Hardy had in his files information that was relevant to his due diligence then—regardless of its source, when it was compiled or the reason it was compiled—he was not only dutybound to know it under the principle of inquiry notice, but his client will be charged with knowing it as well.

The defendants claim that when it comes to information an attorney obtained in the course of a past limited engagement, constructive knowledge is not enough to justify client imputation in a later engagement. Under *Otis v. Zeiss* (1917) 175 Cal. 192, *Chapman v. Hughes* (1901) 134 Cal. 641, 647, and *Cooke v. Mesmer* (1912) 164 Cal. 332, they argue, "the knowledge of an attorney is the knowledge of his [or her] client" only so long as it is knowledge acquired "in the course of the particular transaction in which he [or she] has been employed by that principal" (*Otis*, *supra*, at pp. 195–196), and any knowledge acquired before that is subject to a different rule. (See also *Christie v. Sherwood* (1896) 113 Cal. 526, 530; *Bogart v. George K. Porter Co.* (1924) 193 Cal. 197, 209–210.) In the defendants' telling, these cases demonstrate that any knowledge gained by Hardy during his earlier engagement in 2005 is not chargeable to Ram's Gate unless there is " 'clear and satisfactory proof' " that Hardy had an awareness of the Boudreau Report in his mind during the November 2006 due diligence period. (*Otis*, *supra*, at p. 196.)

The foundational case in this line of precedent—and the linchpin of the defendants' agency analysis—is *Wittenbrock*, *supra*, 102 Cal. 93, which

46

recognizes that there may still be imputation to a client of an attorney's knowledge gleaned from past work, even for a different client on a different transaction, including if his work "closely follows and is intimately connected with" the prior transaction.[24] (*Wittenbrock*, at p. 103; see *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 288; *Columbia Pictures Corp. v. De Toth* (1948) 87 Cal.App.2d 620, 631; *Otis v. Zeiss*, *supra*, 175 Cal. at pp. 195–196; *Cooke v. Mesmer*, *supra*, 164 Cal. at pp. 338–339.) If such a nexus is present, what must be shown by "clear and satisfactory proof" is that the agent had present in mind "knowledge of the former *transaction*" (*Wittenbrock*, *supra*, at p. 103, italics added), not every detail of it, which is where the defendants go wrong in emphasizing Hardy's lack of awareness of the Boudreau Report itself. Nothing in *Wittenbrock* or in the underlying agency principles applied in that case displaces the basic statutory rule of inquiry notice under Civil Code section 19.

Hyde claims that imputing to Ram's Gate Hardy's knowledge from a past client relationship with a different client "would contravene law and policy because it would effectively require a breach of professional confidences to impute the attorney's confidential investigation and records for one client to a second stranger to the engagement." For this proposition, he cites a pre-*Erie* federal bankruptcy case, *In re Locust Building Co.* (2d. Cir.

---

[24] The *Wittenbrock* court stated: "Pomeroy's Equity Jurisprudence, section 672, states the general rule to be limited by cases in which the transaction in question closely follows and is intimately connected with a prior transaction in which the agent was also engaged, and in which he acquired material information, *or* where the information obtained by the agent in a former transaction was so precise and definite that it is or must be present to his mind and memory in the second transaction, then such information operates as constructive notice to the principal in such second transaction." (*Wittenbrock*, *supra*, 102 Cal. at p. 103, italics added.)

1924) 299 F. 756.  Putting to one side the fact that *In re Locust Building Co.* does not apply California law and thus has no value as precedent on an issue that was settled in California decades before it was decided in 1924, that case applies the same rule *Wittenbrock* does—the "doctrine of imputed notice to a client rests upon the ground that the attorney has knowledge of something material to the particular transaction which it is his duty to communicate to his principal" (*In re Locust Building Co.*, *supra*, at p. 769)—drawing the rule from *Distilled Spirits*, *supra*, 78 U.S. 356, just as *Wittenbrock* did.

Long ago, Hyde's public policy objection was indeed the basis for a different rule in some English common law cases holding that there should never be client imputation from an attorney's knowledge gained from a past transaction for a different client.  (*Distilled Spirits*, *supra*, 78 U.S. at pp. 366–367 & fn. 12, citing the opinion of Lord Hardwicke in *Warrick v. Warrick* (1745) 26 Eng.Rep. 970, 972.)  But there was a split in the common law authorities, with other cases recognizing under principles of equity that where " 'one transaction might . . . follow so close upon the other as to render it impossible to give a man credit for having forgotten it,' " we " 'should be unwilling to go so far as to say, that if an attorney has notice of a transaction in the morning, he shall be held in a court of equity to have forgotten it in the evening; it must in all cases depend upon the circumstances.' " (*Id.* at p. 366, citing the opinion of Lord Eldon in *Mountford v. Scott* (1823) 37 Eng.Rep. 1105, 1107.)

This common law split was eventually resolved in favor of Lord Eldon's view in *Dresser v. Norwood* (Exch. Chamber 1864) 144 Eng.Rep. 188, 194. (*Distilled Spirits*, *supra*, 78 U.S. at pp. 366–368.)  In *Distilled Spirits*, the United States Supreme Court followed *Dresser*, but to account for the very policy concern Hyde now presses, made the rule subject to "the qualification

48

that the agent [must be] at liberty to communicate" to the current client the knowledge so imputed. (*Id.* at p. 367.) That qualification accounted for circumstances in which an attorney was bound not to disclose past-acquired knowledge to a new client by reason of conflict of interest or any other continuing obligation of nondisclosure. The formulation of the *Dresser* rule in *Distilled Spirits*—along with this proviso for confidentiality—was adopted in *Wittenbrock* and remains operative in California to this day. (*Wittenbrock, supra,* 102 Cal. at pp. 102–104.) But the confidentiality proviso is not relevant here because, on this record, neither Hyde nor Ram's Gate has offered any credible basis to believe that Hardy was bound—to anyone—to maintain the "confidentiality" of the Boudreau Report, a copy of which was freely available in public files.

Applying the foregoing principles of agency law to this case, the required *Wittenbrock* nexus seems plain on this record. There is no dispute that Hardy was aware of and familiar with the attempt to purchase the Roche winery in 2005. That proposed deal provided the template for the terms of sale when negotiations resumed. There is also no dispute that, even within the scope of the preliminary due diligence Hardy did in 2005, he and Davenport discussed the presence of a "fault" on the winery site, a fact from which the reasonable inference may be drawn that he had greater reason to be sensitive to seismic issues than the mere fact, admittedly understood by all involved, that the site fell within an Alquist-Priolo Earthquake Fault Zone because of the Rodgers Creek Fault (that general level of awareness is all Roche had to work with in seeking summary judgment).

But in the end what is dispositive—because of its unmistakable specificity—is that in late November 2006 Roche sent Hardy a copy of the HLA Proposal, which expressly stated: "Previous fault investigations of the

49

winery and mapping by [CDMG] have identified active fault traces in the vicinity of the winery buildings." Having been specifically advised of the existence of "previous fault investigations" and "active fault traces" near the winery buildings, and having had discussions with Davenport in 2005 about a specific "fault" on the property (not just the Rodgers Creek Fault), we conclude that Hardy was dutybound under Civil Code section 2332 to retrieve the Boudreau Report from the 2005 Due Diligence Binder and brief O'Neill on what it revealed. He failed to do so, as O'Neill's April 2016 declaration makes clear.[25] Hyde insists there can be no client imputation of information that was simply "available" to the client's attorney. (*Sibert v. Shaver* (1952) 111 Cal.App.2d 833, 840–841; *Fletcher v. Allen* (1921) 51 Cal.App. 774, 778–779.) But he fails to take account of Civil Code section 19. There was more than simply "available" information here. There were good reasons Hardy should have known it.

After completing the acquisition, O'Neill turned to RGH, commissioned another seismic hazard study in 2008, and when RGH reported the existence of active fault traces on the site—confirming exactly the same fault trace Boudreau had previously identified, as well as other fault traces nearby, just as Boudreau did—he apparently considered the RGH Report to be news. In fact, that was the basis for the delayed discovery-of-harm argument Ram's Gate used to defeat the statute of limitations prong of Roche's summary judgment motion. But there is prima facie evidence here that O'Neill would have known the RGH Report was not news had Hardy told him about or sent him the Boudreau Report in November 2006. Under the circumstances, we

---

[25] O'Neill Declaration at page 8 ("No one ever brought these documents [the 2005 due diligence documents copied from the PRMD file] to my attention.").

conclude Hardy was on inquiry notice of the Boudreau Report when the winery sale closed, making Hardy's knowledge, in turn, conclusively imputable to Ram's Gate. (*Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 166 (*Stevenson*) ["By warning the [buyers in a commercial real estate] . . . purchase contract that they took title subject to easements of record, [the seller] put them on notice of the" material fact there was an oil pipeline easement running through the purchased property, "which satisfied his duty of disclosure under the express terms of the contract."].)

In a last effort to stave off imputed knowledge of the Boudreau Report, the defendants argue they cannot be charged constructively to know what Hardy knew, actually or by constructive notice, because Roche stood accused of making intentional, affirmative misrepresentations. The cases they cite are real estate misrepresentation cases where the defendants were held to be potentially liable even though the plaintiffs arguably could have discovered the truth from public records. In such a scenario, these courts hold, the law does not place upon a fraud victim any obligation to discover the fraud against him. (*Seeger v. Odell* (1941) 18 Cal.2d 409, 414–415 (*Seeger*) ["As a general rule negligence of the plaintiff is no defense to an intentional tort. [Citation.] The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery."]; *Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1503 [" ' "[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool" ' "].) But this is not a situation where Hardy needed to undertake an investigation. In the exercise of reasonable diligence, all he needed to do was review his own files. None of the cases in the *Seeger* line involves information that, as we have here, was equally available to both buyer and

51

seller upon an exercise of reasonable diligence.  (*Stevenson*, *supra*, 65 Cal.App.4th at pp. 166–167.)

b. *None of the defendants' arguments concerning corporate separateness or different transactions defeats Roche's prima facie showing as a matter of law*

We reject defendants' attempt to avoid imputation factually, as well as legally.  Reading the record in favor of Roche, as we must, we conclude there was one continuous, though episodic, stream of business activity here, carried out by essentially the same parties.  Even under the narrow reading the defendants give *Wittenbrock*, *supra*, 102 Cal. 93, our view of the transactional history and the parties involved undermines a central pillar of the position they take on imputation:  Their reliance on technical and formalistic arguments that JHP Land I was a separate entity from JHP Land II, and their dissection of the business activity here into two separate and distinct transactions, a first unsuccessful acquisition attempt by JHP Land I in 2005, and a second successful acquisition in 2006 by JHP Land II.

As is the case with many of the points of error urged on this appeal, Hyde and Ram's Gate advance different variations of the same line of argument.  Hyde argues there was no "continuity nor unity of interest as between" JHP Land I and JHP Land II.  He emphasizes that JHP Land I was represented by the Clement firm, and JHP Land II was represented by Hardy as a solo practitioner.  Without disavowing the notion that JHP Land I and JHP Land II were separate and distinct entities and, legally, should be treated as such, Ram's Gate, for its part, emphasizes differences in the transactions in 2005 and 2006, rather than differences in the entities.  According to Ram's Gate, the provenance of the 2005 Due Diligence Binder was not in Hardy's "work as Ram's Gate's attorney in the 2006 transaction."  "[H]e obtained it," Ram's Gate points out, "while working for a different

52

entity, JHP Land [I], regarding a different transaction," and never even knew the Boudreau Report was in his possession because of the limited scope of his due diligence engagement in 2005.

None of these arguments defeats Roche's showing as a matter of law. It is wholly artificial to treat what happened here as equivalent to two completely different transactions, undertaken for two completely different clients, under the guidance of two law partners working on each transaction independently of one another, which was the scenario presented in *Wittenbrock*, *supra*, 102 Cal. 93. The time lapse was only 12 months from the end of the 2005 negotiations to the start of the 2006 negotiations. Except for a reduction in price, the subject matter of the 2006 deal was the same as the proposed deal in 2005, as was its basic structure (purchase of the winery site, its buildings and equipment, along with a residential leaseback to the Roches on an adjacent parcel). The buyer-side lawyer, broker and point man for due diligence, Hardy, was the same, except he reported to O'Neill instead of John, and he had changed law firms, having left the Clement firm to open a solo practice, but without changing his office location in St. Helena or the location of his files.

The buyer—an entity known as JHP Land, LLC—was the same as well, except for some minor changes in corporate form and ownership. The putative buyer in 2005, a limited liability company co-owned by John and Hansen (JHP Land I) which did business as JHP Land, LLC, dissolved in July 2006. O'Neill then joined John and Hansen as a one-third owner, and in mid-November 2006, the same day the PSA with Roche was executed, the trio formed a new limited liability company (JHP Land II) to serve as the buying entity, doing business under the same name as its predecessor, JHP Land,

53

LLC. By the time the case against Roche was filed, the entity once known as JHP Land, LLC had changed its name to Ram's Gate.

We are not persuaded that any of the slight changes from 2005 to 2006, either in the transaction or in the cast of characters, materially alters the agency analysis. The contrary point of view, coming from Hyde, with his emphasis on different buyer-side entities, represented by different lawyers, and coming from Ram's Gate, with its emphasis on differences in the nature of the transactional activity and the limited scope of Hardy's 2005 engagement, fails for three reasons.

First, no legally meaningful distinction can be drawn between the Clement firm and Hardy so long as the information at issue (the 2005 Due Diligence Binder) was obtained while Hardy was a Clement partner—a fact which the defendants admit is undisputed. Hardy brought to his representation of JHP Land II whatever knowledge he acquired as a Clement partner, actually or constructively. Law firms act through individual attorneys, and when a client retains an attorney, he or she retains the entire firm. (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 392 (*Christensen Miller*).) When an individual attorney leaves a firm, the law presumes that his or her knowledge travels to the attorney's new practice destination as well, which is why "the concern for client confidences, like the attorney's duty to preserve those confidences, continues after the attorney's services end." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1147.)

Second, the distinction between JHP Land I and JHP Land II is legally irrelevant. Any knowledge imputed to JHP Land I through its agents, Hardy or John, is also imputed to its corporate successor, JHP Land II. (*Blue*

54

*Diamond Plaster Co. v. Industrial Accident Commission* (1922) 188 Cal. 403, 408–409 [knowledge of managers employed by predecessor corporation, Temescal Rock Company, whose plant operations were purchased and taken over by a successor corporation, Blue Diamond Plaster Company, imputed to successor, where same managers continued to be employed by successor]; *Dicker v. Italo-American Oil Corp.* (1931) 119 Cal.App. 451, 453, 456 (*Dicker*) [knowledge of directors of Italo-American Oil Corporation, a Nevada corporation, imputed to affiliated corporation, Italo-American Petroleum Corporation, a California corporation, where California corporation created Nevada corporation for purposes of avoiding creditors' claims, and the same individuals served as directors of both corporations].)

Hyde attempts to distinguish these cases on the ground that they do not apply because, under the defendants' narrow reading of *Wittenbrock*, *supra*, 102 Cal. 93, "clear and satisfactory proof" that Hardy or John had actual knowledge of the Boudreau Report is lacking. But as we have explained, that reading of *Wittenbrock* is incorrect. In his reply brief and on petition for rehearing, Hyde adds the argument that only if there is such a complete identity of common ownership between JHP Land I and JHP Land II as to justify veil piercing under the alter ego doctrine could there be imputation to JHP Land II. This, too, is incorrect. Not only does he miscite the principal alter ego case he relies upon (*CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775), erroneously claiming it stands for the proposition that there must be "common ownership" before that doctrine will apply (*id.* at p. 789 [no veil piercing where alleged alter ego owners had no "direct ownership" in corporate entity through which they borrowed money]), but alter ego is the wrong frame of reference in any event. Roche has ample grounds to argue there is no legally cognizable difference between JHP

55

Land I and JHP Land II under the doctrine of corporate successor liability. (See *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1319, 1322, 1328 [" 'mere continuation' " of a corporation's unincorporated business line by a new corporation with nearly the same management and nearly the same ownership justifies imposition of corporate successor liability].)[26]

Third, as to the possibility that Winter had sole possession of the 2005 Due Diligence Binder in Santa Rosa and the uncertainty surrounding what, if anything, she communicated to Hardy about the binder's contents—not to mention what she herself knew of its contents, an issue Ram's Gate, in its rehearing petition, emphatically contends is nowhere addressed in the evidence—a fair inference may be drawn from the fact she copied the Boudreau Report and included it in the 2005 Due Diligence Binder that she was familiar with it and determined it was relevant to the work she was doing for Hardy.[27] Her knowledge was imputed to Hardy as her law partner and to John as their principal. (See *Christensen Miller*, *supra*, 150 Cal.App.4th at p. 392.) It is not just the lead partner's knowledge that

---

[26] As is the case with alter ego analysis, "[i]t is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice." (*Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514, 523; see *Cleveland v. Johnson, supra,* 209 Cal.App.4th at pp. 1328–1330.)

[27] Ram's Gate argues that Winter, necessarily, since she was working under the same terms of engagement as Hardy was, could not have been conducting an inquiry any broader than Hardy's limited preliminary due diligence investigation. Limited though it may have been, it is undisputed that, according to Hardy, he and Davenport *did* discuss seismic issues in 2005 to the extent they bore on the issue of water rights. Winter's inclusion of the Boudreau Report in the 2005 Due Diligence Binder is consistent with that. Approximately a third of the discussion in the Boudreau Report addresses the impact of fault traces on the water extraction potential in the rock formations underneath the winery site.

will be imputed to the client, but the knowledge of any attorney in the firm who worked on the transaction, at least as to knowledge acquired in connection with matters to which he or she was assigned.

## 2. In Evaluating Whether Roche Made Out a Prima Facie Case of Likelihood of Success on the Element of Lack of Probable Cause, We Draw All Reasonable Inferences from the Record Evidence in Roche's Favor

Claiming there is, at least, a conflict in the evidence concerning what information Ram's Gate and Hardy possessed, what they knew, and when they knew it, the defendants argue that all inferences must be drawn in their favor, contrary to the standard approach we take on review of an anti-SLAPP ruling. Although none of the defendants presented this line of argument in their respective opening briefs, we will address it now that it has been fully briefed on rehearing.

In his petition for rehearing, Hyde makes the most sweeping version of the argument. He contends that under the governing tenability standard, all evidence favorable to him must be accepted as true. The only case he cites for this argument, *Daniels*, *supra*, 182 Cal.App.4th 204, holds nothing of the kind. In *Daniels*, the sole respondents on appeal in the malicious prosecution case were the lawyers who brought the underlying case. (*Id.* at p. 210.) Affirming an anti-SLAPP dismissal as to the attorneys, the Court of Appeal held that the malicious prosecution plaintiff made out a prima facie case of likelihood of success on favorable termination and lack of probable cause, but that—even reading the record in her favor—she presented no evidence of malice. (*Id.* at pp. 217, 222, 224–227.) There is no suggestion in *Daniels* that the law of malicious prosecution changes any of the normal precepts of appellate review in an anti-SLAPP appeal. As far as we can discern from the page-cite from *Daniels* upon which Hyde relies—which points to a passage quoting from a frequently cited standard of review discussion in *HMS*

*Capital*, 118 Cal.App.4th at page 212—Hyde appears to mistake the court's statement that " '[t]he court's responsibility is to accept as true the evidence favorable to *the plaintiff* " (*Daniels*, *supra*, at p. 215, italics added) for a reference to the plaintiff in the underlying action (here Ram's Gate), rather than the plaintiff in the malicious prosecution action (here Roche).

Ram's Gate's spin on the same argument is more developed than the one Hyde advances, but we reject it as equally unfounded. Relying on *Parrish, supra,* 3 Cal.5th 767, *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031 (*Plumley*), and *Cheong Yu Yee v. Cheung* (2013) 220 Cal.App.4th 184 (*Yee*), Ram's Gate contends, "[i]t is well-established [that] a genuine issue of material fact cannot defeat probable cause, even if the malicious prosecution court views the claim as weak or unlikely to succeed." Starting from the unremarkable premise that this "is a substantive rule regarding how probable cause must be evaluated," Ram's Gate goes on to suggest that this substantive rule has significant *procedural* implications—"overriding the usual rule that on an anti-SLAPP motion, the facts must be construed in favor of the non-moving party." This proposition, if adopted, would effectively create a special procedural rule for malicious prosecution defendants in the " ' "summary-judgment-like" ' " process (*Sweetwater*, *supra*, 6 Cal.5th at p. 940) at step two of the anti-SLAPP analysis.[28]

We are not persuaded. Ram's Gate offers no direct authority for such a procedural innovation but instead asks us to cobble it together from bits and

[28] Ram's Gate would still have us apply the usual rule in which we read the record to favor the non-movant when assessing favorable termination, to factual disputes preliminary to the ultimate legal question of probable cause, and presumably, to malice, while reversing the rule and reading the record to favor the movant only for the element of probable cause.

pieces of other principles of tenability law. Pointing to the rule that, in reviewing the legal tenability of claims attacked as malicious, courts construe the allegations in the underlying action favorably to the malicious prosecution defendant, Ram's Gate argues the same principle must apply "equally to the plaintiff's ability in the underlying case to marshal evidence." To illustrate the point, Ram's Gate points to *Yee*, where the trial court denied a nonsuit motion in an action by an arts organization known as Lin Wah against Cheong Yu Yee, alleging misappropriation of funds. (*Yee*, *supra*, 220 Cal.App.4th at pp. 190–191.) The court sent the case to the jury, giving Lin Wah the benefit of the doubt that its proof was sufficient to make a prima facie case. (*Id*. at p. 191.) The jury found against Lin Wah, and in an ensuing malicious prosecution case by Cheong Yu Yee against Lin Wah and its attorneys, the court granted an anti-SLAPP motion. (*Id*. at pp. 191–192.)

The Court of Appeal affirmed, concluding that "in this case, the trial court's determination on the motion for nonsuit that there was sufficient evidence to allow the jury to decide the questions presented by the case means that a reasonable attorney could have concluded" that the action against Cheong Yu Yee "was not ' "totally and completely without merit." ' " (*Yee*, *supra*, 220 Cal.App.4th at p. 201.) The only evidence Cheong Yu Yee presented to show the suit was brought without probable cause consisted of the jury's verdict, and some nit-picking about inconsistencies in a witness's testimony at trial. (*Id*. at p. 202.) Even granting that there were some inconsistencies in the witness's prior deposition testimony, the court found that they would not have changed the result on the nonsuit motion. (*Ibid*.)

We read this holding as a straightforward application of the principle in malicious prosecution law that "has come to be known as the interim adverse judgment rule" (*Parrish*, *supra*, 3 Cal.5th at p. 771), which is the

59

principle for which Ram's Gate cited *Yee* in its opening brief before proposing a more aggressive reading in its reply brief and its petition for rehearing. Ram's Gate's initial treatment of *Yee* as an interim adverse judgment case was the right one. If, as a matter of law, a malicious prosecution claim cannot succeed—under the interim adverse judgment rule, or any other mode of defeating a malicious prosecution claim while conceding the plaintiff's factual showing to be true—dismissal will be required at step two of the anti-SLAPP analysis. *Yee* stands for nothing broader than that.

It turns out that the defendants are not alone in trying to push the envelope of tenability law in the way they propose here, creating another layer of protection for malicious prosecution defendants under the anti-SLAPP statute, beyond the robust protection that substantive tenability principles give them. In *Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442 (*Kinsella*), which reverses the grant of an anti-SLAPP motion in a malicious prosecution case, a Fourth District, Division One panel recently rejected the argument that substantive tenability law requires a departure from the usual rules of procedure governing step two of anti-SLAPP motions. (*Id.* at p. 462.) We join our colleagues there and decline the invitation to create a special rule of procedure favoring malicious prosecution defendants at the likelihood of success stage of an anti-SLAPP motion. Because, by its own terms, the interim adverse judgment rule would defeat Roche's malicious prosecution claim as a matter of law if it applied—even assuming Roche's version of the facts to be true—we see no need to adopt a previously unrecognized mode of procedure. We therefore turn directly to whether the interim adverse judgment rule applies.

## 3. The Interim Adverse Judgment Rule Does Not Apply

a. *Discovery misconduct can trigger the fraud or perjury exception*

The interim adverse judgment rule, which is a corollary of principles governing the probable cause element of malicious prosecution claims, was established long ago in cases going back to the nineteenth century where litigants successfully brought suit, won at trial and secured a judgment, only to lose on appeal and then face allegations of malicious prosecution for having sued in the first place. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817–818 & fn. 2 (*Wilson*); see *Fairchild v. Adams* (1959) 170 Cal.App.2d 10, 15; *Crescent City Live Stock Co. v. Butchers' Union Slaughter-House Co.* (1887) 120 U.S. 141, 149–151 (*Crescent City Live Stock*).) Hence the moniker "interim," which in these early decisions generally meant a victory embodied in a judgment before it became final on appeal. The rule is subject to an equally well-rooted exception that applies to situations in which the judgment was procured by fraud or perjury. (*Carpenter, supra,* 153 Cal. at pp. 217–218.)

In recent years, the interim adverse judgment rule has been extended to certain pretrial rulings (*Wilson, supra,* 28 Cal.4th at p. 815), including summary judgment (*Parrish, supra,* 3 Cal.5th at pp. 771–772). This fairly new strand of interim adverse judgment case law, *Parrish* in particular, is the focal point of defendants' argument. Under these cases, if applicable here, it would not matter if Roche came forward now with evidence that Ram's Gate sued without probable cause, because that issue was litigated before—on summary judgment in the underlying case—and thus may not now be reopened. But does the fraud or perjury exception apply? That is the question posed by Judge Chouteau's finding that, despite Ram's Gate's summary judgment victory, the rule does not apply because of improper withholding of responsive discovery.

61

Because the fraud or perjury exception long predates *Wilson* and *Parrish*, its nature and reach in the civil pretrial context are not well defined. Both of those cases dealt with pretrial decisions on the merits, as does this case, but here we have an added twist, presenting a question that could not have been anticipated when the fraud or perjury exception was first developed, since discovery in civil practice was unknown at that time. The question, which appears to arise here as a matter of first impression, is this: Can discovery misconduct trigger the fraud or perjury exception, thus undermining the preclusive effect we would otherwise give a summary judgment denial under *Parrish*? On this record—which shows that Ram's Gate, in violation of multiple court orders, withheld evidence material to Roche's ability to obtain summary judgment, and the suppressed evidence came to light only after the summary judgment ruling was made—we conclude that the answer is yes, the exception does apply. (*Carpenter*, *supra*, 153 Cal. at p. 218.)

We begin from the premise that the breadth of the exception should be defined by its rationale. The reason for the exception, as we discern it, is that any application of the interim adverse judgment rule must rest, foundationally, on the integrity of the record underlying the prior adverse ruling that is claimed to have preclusive effect. This concern is generally not triggered by dishonesty or malfeasance that is merely intrinsic to an adversary proceeding, such as reliance on alleged untruths or fabricated evidence that a litigant has had a full and fair opportunity to meet and test. But it is unquestionably triggered when a judgment was procured by extrinsic fraud, which has the effect of denying a litigant a fair hearing on its claims or defenses, thus corrupting the litigation process itself. What makes the issue in this case challenging is that the dividing line between intrinsic

fraud, on the one hand, and extrinsic fraud, on the other, has always been somewhat elusive, even in its traditional setting of collateral review. (*Los Angeles Airways, Inc. v. Hughes Tool Co.* (1979) 95 Cal.App.3d 1, 7 (*Hughes Tool*) ["[t]he extrinsic/intrinsic fraud rule is a doctrine developed in courts of equity governing the basis for successful collateral attack on a final judgment by way of an independent proceeding"].)

In assessing the utility of the extrinsic versus intrinsic fraud distinction as a tool of analysis here, we are mindful that the interim adverse judgment rule promotes finality and repose. But the *Wilson* court has explained that the interim adverse judgment rule does not derive from other rules of repose such as claim preclusion or issue preclusion. (*Wilson*, *supra*, 28 Cal.4th at p. 825.) It operates differently in a number of respects, and chief among them is that it is rebuttable. The fraud or perjury exception is the most commonly recognized means of rebuttal (*Kinsella*, *supra*, 45 Cal.App.5th at pp. 456–457), traceable to the earliest nineteenth century interim adverse judgment cases. (*Heck v. Humphrey* (1994) 512 U.S. 477, 484, fn. 4.)

It is debatable whether the exception applies only to conduct classically defined as extrinsic fraud—amounting, essentially, to a violation of due process (*Hughes Tool*, *supra*, 95 Cal.App.3d at p. 7)—or whether it also extends to " 'unfair conduct' " falling short of what might "support an action for the setting aside of a judgment[.]" (*Carpenter*, *supra*, 153 Cal. at p. 218; see *Parrish*, *supra*, 3 Cal.5th at p. 783 [noting that *Carpenter* has only been cited three times by the California Supreme Court in more than a century since it was decided]; cf. *Plumley, supra,* 164 Cal.App.4th at p. 1056, fn. 10 [questioning whether language in *Carpenter* suggesting that "either extrinsic

63

*or intrinsic* fraud may be relied on to avoid the interim adverse judgment rule" remains good law][29].)

But however pertinent this unresolved question may be to a scenario where the malicious prosecution plaintiff not only has an opportunity to litigate the consequences of the alleged fraud in the underlying case, and then actually litigates the issue and loses, thus barring its relitigation post-judgment (*Plumley*, *supra*, 164 Cal.App.4th at pp. 1052–1056), the situation here is different. The concept of extrinsic fraud is fundamentally designed to preserve the sanctity of final judgments. Here, the "judgment" we are

---

[29] We asked the parties to submit supplemental briefs addressing, among other things, whether *Plumley* accurately states the holding of *Carpenter*. Ram's Gate, in its supplemental brief, takes the position that "*Plumley* does not accurately interpret *Carpenter*" and then goes on to offer the view that "the cases that have interpreted *Carpenter* as adopting a general rule that the fraud which enables a malicious prosecution plaintiff to avoid the interim adverse judgment rule 'may be either extrinsic or intrinsic' "—which is the expansive interpretation of *Carpenter* that *Plumley* appears to give it—"are in error." (Citing *Norton v. John M.C. Marble Co.* (1939) 30 Cal.App.2d 451, 454; see also *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 639.)

It is not for us to decide whether the handiwork of our sister courts is in error, but we agree it is probably too much to say that *Carpenter* permits invocation of the fraud or perjury exception for any species of misconduct that might qualify as fraudulent. The misconduct in *Carpenter*, which involved a malicious prosecution claim arising out of underlying criminal proceedings, was knowing use of perjured testimony. (*Carpenter*, *supra*, 153 Cal. at pp. 216, 218.) Among the handful of appellate courts applying *Carpenter* to malicious prosecution claims arising out of underlying civil litigation, we are not the first to extend its holding to intentional corruption of the pretrial process in some form. (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 384 ["[I]f denial of summary judgment was induced by materially false facts submitted in opposition, equating denial with probable cause might be wrong. Summary judgment might have been granted but for the false evidence."]; *Kinsella*, *supra*, 45 Cal.App.5th at pp. 451, 456 [same].)

64

focused upon is the denial of a summary judgment motion, a provisional ruling that by definition takes place prior to a full contest at trial and before any available post-trial remedies for dealing with newly discovered evidence have been exhausted. The level of adversarial testing at this stage does not compare to the more robust process we must presume has been afforded by the time final judgment is entered. In our view, the degree of finality that attaches is commensurately weaker as well. The issue, distilled to its essence, is that we are dealing with procurement of a *summary judgment denial* by fraud, not procurement of a *final judgment* by fraud. The difference matters to the preclusive weight we must extend.

Because summary judgment rulings necessarily rest on the accuracy of the "paper" record made in pretrial discovery, we think the fraud or perjury exception must apply to discovery misconduct that deprives a summary judgment movant of a fair hearing on the merits of the motion itself. To place the analysis within the high-level framework of interim adverse judgment principles, the rule "has respect to the court and to its judgment, and not to the parties, and no misconduct or demerit on their part, except fraud in procuring the judgment itself, can be permitted to detract from its force." (*Crescent City Live Stock*, *supra*, 120 U.S. at p. 159.) In applying this rule, "an invincible presumption of the law" is that where a "judicial tribunal, acting within its jurisdiction, has acted impartially and honestly[,] *[t]he record of its proceedings imports verity[.]*" (*Ibid.*, italics added.) What we hold is that in circumstances where we cannot say the record of a summary judgment proceeding "imports verity" (*ibid.*)—because discovery misconduct has corrupted it—the fraud or perjury exception applies, whether the misconduct would qualify as extrinsic fraud for purposes of collateral review or not.

65

b. *Ram's Gate's withholding of the Boudreau Report in deliberate violation of multiple discovery orders amounts to fraudulent concealment*

We preface our evidentiary evaluation of the applicability of the fraud or perjury exception with another reminder that we are not making factual findings. Our task is to evaluate this issue while drawing inferences in favor of Roche, as we have done with all of the issues presented in these appeals. But because this particular issue turns on alleged sharp practices and breach of ethics of the most serious kind, charges largely directed toward Hyde as the architect of Ram's Gate's tactics and strategy in the underlying case, we must in fairness stress once again the limited nature of our inquiry. Although, as we explain below, we conclude upon de novo review that the indictment Roche brings fully warrants public castigation of those who bear responsibility for the charged misconduct, it is essential to bear in mind that, at this stage, we are only evaluating the prima facie sufficiency of Roche's proof.

Roche alleges that by improperly withholding the 2005 Due Diligence Binder, Ram's Gate adopted a discovery strategy designed to mislead the court into believing Hardy never had possession of the Boudreau Report, thereby blocking Roche from pursuing his most effective line of defense on summary judgment. The point of this strategy, if executed successfully—and it was carried out successfully until shortly before trial—was to destroy the predicate for any argument that Ram's Gate knew of the Boudreau Report when it brought suit. Tactically, the objective was to limit Roche to the argument that Ram's Gate should have discovered the Boudreau Report in public files, which was an unwinnable argument on summary judgment since it implicated factual issues going to the reasonableness of Ram's Gate's due diligence investigation. By forcing Roche into this posture, Ram's Gate

66

sought to cut off the much stronger—and we believe likely case-dispositive—argument that Ram's Gate already had possession of the information it blamed Roche for failing to disclose.

As a theory of the case, this approach made sense—except for one problem: Because Hyde had possession of evidence showing Ram's Gate's awareness of the Boudreau Report through Hardy, the theory did not fit the facts. So Hyde set about to manipulate the provable facts available to Roche. That is evident not only from the documented course of discovery, but from Hyde's own explanation of his thinking in a September 28, 2016 declaration filed by Ram's Gate in support of the anti-SLAPP motion. The pertinent discovery history begins with Roche's service of his first set of document requests on Ram's Gate in August 2011. These requests called for production of written communications between Hardy and Ram's Gate or any of its present or former "officers," "executives," "partners," "attorneys," "agents," or "affiliates, predecessors or successors in interest." Because the requests required production of the contents of Hardy's JHP Land I client files, including the 2005 Due Diligence Binder, which contained the Boudreau Report, they probed directly at the critical weakness in Ram's Gate's case theory.

Hyde's September 2016 declaration makes plain how he expected to deal with this predictable discovery thrust from Roche. He filed the case believing he could avoid producing Hardy's JHP Land I client files on the ground they "were not Ram's Gate's records" and that he was holding them in his capacity as counsel not for Ram's Gate, but for John personally "as the

successor for JHP Land I."[30]  That position, which Hyde never formally interposed as an objection to Roche's document requests, but is the only plausible explanation of the stonewalling that took place over the next several years, was untenable from the beginning.[31]  The idea that Ram's Gate could avoid producing the records of a predecessor corporation whose files it controlled was not only frivolous under the governing "possession, custody, or control" standard (Code Civ. Proc., § 2031.220; see *West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 874 [corporate defendant had possession, custody or control of records held by sibling corporation]), but on this record was deceptive.  Hyde pursued it sub rosa, hidden behind baseless privilege objections, which made it all the more frivolous.

The initial skirmish over Roche's first set of document requests, in early 2012, is particularly revealing because it established the discovery position Ram's Gate would take for the next four and a half years.  It is

---

[30] Declaration of Thomas F. Hyde (September 26, 2016) at page 6 ("The Clement JHP I Client File were [*sic*] not Ram's Gate records.  At all relevant times I had custody of the file as counsel for John as a successor to JHP Land I."); *ibid.* ("I made it clear from the outset of the Underlying Action that my office would not produce records in the litigation of JHP Land I in response to discovery served on Ram's Gate.").

[31] Hyde claims he made this position clear from the outset of the litigation, but the record does not bear that out, at least not with respect to Roche.  To support that claim, his declaration cites to meet-and-confer discussions with Roche's co-defendant, seller-side broker Catherine Somple, concerning document requests served by Somple, and to document request responses served by Ram's Gate referring to and incorporating a meet-and-confer agreement he made with her counsel to narrow the scope of her document requests so that they covered only JHP Land II.  According to the proof of service, this discovery was not served on Roche and there is no evidence Roche was part of the meet-and-confer discussions with Somple or was aware of any agreement by her to narrow the scope of her document requests.

elementary in civil discovery that if documents responsive to a document request are withheld on privilege grounds, a privilege log or some equivalent specification of any asserted privilege objection "shall" be supplied. (Code Civ. Proc., § 2031.240.) This feature of the Discovery Act prevents secret positions from being taken to justify the withholding of documents claimed to be secret. Hyde ignored it. Without producing a privilege log—which appears to be the root cause of everything that was to follow, since it would have made it clear, to the trial court, and to Roche, exactly what Hyde was shielding—Ram's Gate tried to justify withholding documents responsive to Roche's document requests on attorney-client privilege grounds. Roche challenged these objections in a November 2011 motion to compel, and in his February 9, 2012 order granting the motion, Judge Daum not only overruled Ram's Gate's privilege objections and compelled production, but directed Ram's Gate to produce a privilege log of documents withheld "for any reason."

Despite the order, Ram's Gate persisted with its refusal to produce the Boudreau Report or to produce a log revealing its existence. It responded by serving a supplemental document request response continuing to assert attorney-client and work product privileges and still refusing to provide a privilege log. Then, when Roche escalated the stakes by bringing a motion for terminating sanctions in April 2012, it shifted ground, with Hyde explaining to the court that "privilege was not really the issue" after all, "but rather that there are simply no documents, privileged or otherwise that have not been turned over during discovery." Since the Boudreau Report was sitting in Hyde's files at the time, this representation was, to put it charitably, inaccurate. The only discernible explanation for it in the record, offered several years after the fact in Hyde's September 2016 declaration supporting the anti-SLAPP motions, is that Hyde claims he thought the

69

Boudreau Report was "not covered" by the February 2012 production order because the order compelled production of document requests served only on the entity Ram's Gate Winery, LLC as a party.

If Hyde had tried to defend Ram's Gate's refusal to produce the Boudreau Report in May 2012 based on such an argument, this position itself would have been sanctionable. Judge Daum's February 9, 2012 order unambiguously overruled Ram's Gate's privilege objections and granted an order compelling production. Unless otherwise expressly limited, an order overruling objections and granting a motion to compel calls for production according to the terms of the document requests that are the subject of the motion. Here, Roche's document requests called for documents not only in Ram's Gate's possession, but under its custody and control. As of February 9, 2012, Ram's Gate was therefore under a court order to produce Hardy's JHP Land I client files. We think it plain that by withholding these files for more than four years based on shifting positions, none of which had any substance, and by treating document discovery as if it were a shell game, Ram's Gate committed a gross misuse of the discovery process, wholly lacking in any justification, much less a substantial one. (Code Civ. Proc., § 2023.030, subd. (a).)

Hyde says he believed Roche could only obtain discovery of Hardy's JHP Land I client files by serving a subpoena on former JHP Land I. But for discovery purposes, there was no practical difference between JHP Land I and JHP Land II because John was a member of both entities and he continued to have access to the dissolved entity's files. Roche could indeed

70

have served a subpoena on former JHP Land I,[32] it is true, and John as its former manager would have been obligated to respond, but if Ram's Gate had possession, custody and control of JHP Land I's records when Roche's document requests were served—which it plainly did, since Hyde had them, as counsel for both Ram's Gate and John—third party discovery was not the exclusive discovery tool available to Roche. The more direct route, and the route Roche took, was a first party document demand defining the obligation to produce coextensively with the concept of legal possession. Once Ram's Gate's privilege and work product objections to that demand were overruled in February 2012, no reasonable civil litigator would have taken the position Hyde did in continuing to refuse production of Hardy's JHP Land I client files.

If Hyde truly thought he could win an argument that there was some impediment to JHP Land II (Ram's Gate) producing the JHP Land I client files on grounds other than the privilege arguments he unsuccessfully made, the occasion to advance the argument was in opposition to Roche's motion as

---

[32] Actually, Roche did make a third party demand for production of documents from Hardy by serving a subpoena on him prior to his June 2012 deposition. But Hyde—who was then suing Hardy on behalf of Ram's Gate for negligence as a co-defendant in the underlying litigation against Roche— requested that Hardy not respond to the demand. Ram's Gate then appears to have dismissed Hardy from the suit without prejudice, subject to a tolling agreement. Oddly, Hyde now claims he thought that to obtain production of the 2005 Due Diligence Binder, which he asserts was the work product of the Clement firm, Roche had to serve a subpoena on the Clement firm itself as the custodian of those files. Putting to one side whether the Boudreau Report qualified as anyone's work product other than Boudreau's and whether Ram's Gate should have listed the document on a privilege log if this issue was of genuine concern, it is unclear why Hyde believed himself capable of making such a judgment—rather than Hardy, a former partner of the Clement firm— and, in the face of a court order, to withhold production on the basis of it.

a basis for narrowing the scope of any compelled production.  He made no such argument, forfeiting it at that point.  The posture he takes now—that he believed the February 2012 order compelling production could not have overruled "third party privileges"—is disingenuous.  If that was a true concern, Hyde was obliged to flag it on a privilege log.  Instead, he obfuscated things by telling Judge Daum, when pressed to explain why Ram's Gate produced nothing in response to the February 2012 order to compel, that "privilege [wasn't] really the issue."  Thus, the bottom line:  There was never a viable legal argument for the position Hyde outlines in his September 2016 declaration stating his intention not to produce JHP Land I's files in response to discovery served on Ram's Gate, and even if there had been a plausible basis for an argument along that line, Hyde passed on the opportunity to advance it by the time the February 9, 2012 production order issued.

Accordingly, we are satisfied that Judge Chouteau's finding that "Roche was improperly denied responsive discovery by Ram's Gate et el., up to and long after the [summary judgment motion] was decided and appealed," is amply supported by the record.  If anything, this finding is understated.  O'Neill was right to be concerned that Judge Daum might issue terminating sanctions on the eve of trial in 2016.  Even after the sanctions order issued in June 2012 compelling production a second time, Ram's Gate still refused to produce the Boudreau Report, which in our view makes what happened here worse than simply improper.  The rigorous standard for issuance of the ultimate civil sanction of dismissal was undoubtedly met.  (*Siry Investment, L.P. v. Farkhondehpour* (2020) 45 Cal.App.5th 1098, 1117–1118.)  Without any apparent appreciation of the seriousness of the misconduct at issue here, Ram's Gate now claims it "sens[ed] that Hyde's behavior had alienated the judge" and as a result arranged for him to step back and cede the lead role in

72

discovery to Paynter.  But the essential problem here was not, and is not now, a matter of style or optics.  What Judge Daum was concerned about, what Judge Chouteau was concerned about, and what we are concerned about, is that Hyde took an objectively indefensible discovery position calculated to hobble his opponent's defense, misled the court about it, and defied multiple court orders in carrying it out.

     c.  *The discovery misconduct here was egregious enough to warrant invocation of the fraud or perjury exception*

The *Parrish* court declined to hold that "inadvertent reliance on factual inferences that turn out to be unsupported at trial" amounted to " ' "other unfair conduct" ' " sufficient to trigger the fraud or perjury exception. (*Parrish*, *supra*, 3 Cal.5th at p. 783.)  There was nothing inadvertent about Ram's Gate's reliance on a misleadingly incomplete factual record to create triable issues and thus defeat summary judgment when it knew that record was contradicted by information in its possession, actually or constructively. Hardy and Hyde had maintained the Boudreau Report in their files since 2005 and 2008, respectively, and before filing suit Hyde had read it, knowing it had been obtained from the 2005 Due Diligence Binder.

As *Parrish* observed in the context of limits on the interim adverse judgment rule, plaintiffs and their attorneys "have no right to mislead a court about the merits of a claim in an attempt to procure a favorable ruling, and such a ruling can provide no reliable indication that the claim was objectively tenable." (*Parrish*, *supra*, 3 Cal.5th at p. 778.)  An attorney is an officer of the court and owes the court a duty of candor.  (*United States v. Associated Convalescent Enterprises, Inc.* (9th Cir. 1985) 766 F.2d 1342, 1346.)  The duty of candor requires attorneys to use "those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."  (Bus. & Prof. Code, § 6068,

subd. (d).) Improperly withholding crucial evidence called for in discovery surely qualifies as an "artifice." The *Parrish* court recognized that the fraud or perjury exception applies when a party makes a representation it knew or should have known was false. (See *Parrish*, at p. 782 & fn. 5.)

Ram's Gate argues that "discovery issues in the Underlying Action did not bear on whether Roche met his burden in this action to prove each essential element of his malicious prosecution action with admissible evidence." Citing *Sheldon Appel Co.*, *supra*, 47 Cal.3d 863 and *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 (*Cedars-Sinai*), for the proposition that "[d]iscovery issues must be adjudicated in the case in which they arise," Ram's Gate argues that Roche, "[h]aving settled the Underlying Action and foregone discovery-specific remedies such as monetary, issue, and terminating sanctions, cannot resurrect those issues now in derivative litigation." In *Cedars-Sinai*, a spoliation case, our Supreme Court declined to allow conduct that could be remedied through discovery sanctions to serve as the basis of a separate tort cause of action. (*Id.* at pp. 4, 12–13, 16–17.) As a matter of policy, the *Sheldon Appel Co.* court relied on similar reasoning in the context of malicious prosecution. (*Sheldon Appel Co.*, *supra*, at pp. 873–874.)

But we do not suggest that discovery misconduct may serve as a basis for a determination that Ram's Gate lacked probable cause to sue. Rather, what we hold is that, at least on this record, misconduct in discovery is relevant to whether the fraud or perjury exception to the interim adverse judgment rule applies. Contrary to Ram's Gate's assertion that Roche passed on the opportunity to obtain redress for discovery misconduct in the underlying case, he did not "settle" the underlying case against him, as we explained above. Absent a release—which litigants are of course free to

negotiate upon the resolution of any action, thus controlling their own future exposure to subsequent litigation—discovery misconduct can have consequences for the party or the attorney committing it. All we hold is that, in the absence of a release, those consequences may include inability to rely on the interim adverse judgment rule in subsequent malicious prosecution litigation.

> d. *The improper withholding of the Boudreau Report deprived Roche of a fair hearing on the merits of his summary judgment motion*

Even if there was some kind of discovery misconduct here and even if we do take it into account in determining the applicability of the fraud or perjury exception, the defendants contend that Roche still cannot overcome the interim adverse judgment rule unless he is able to show—which they insist he cannot—that he would have prevailed on summary judgment in March 2013, had he been in possession of the document at that time. They argue that the Boudreau Report would have made no difference, and at most there would have been triable issues had it been part of the record at the summary judgment stage of the underlying case, leading to exactly the same result.

We do not agree. We think that Hardy's possession of the Boudreau Report supplied the basis for an argument that likely would have been resolved in Roche's favor, as a matter of law, on summary judgment. (*Alfaro*, *supra*, 171 Cal.App.4th at p. 1393 [where deed restrictions in deeds gave plaintiff home buyers enough actual knowledge to put them on inquiry notice of undisclosed information concerning the alleged impact of these restrictions on marketability, dismissal of complaint by buyers whose deeds contained these restrictions affirmed]; *see also Stevenson*, *supra*, 65 Cal.App.4th at p. 166 [affirming summary judgment where seller's disclosure was adequate to put buyer on inquiry notice of allegedly concealed fact].) The defendants

resist this conclusion, arguing that the fraud or perjury exception does not apply unless it can be said that Roche would have won on summary judgment "but for" the misconduct that triggers the exception. In the absence of a reliable summary judgment record, of course we cannot go so far as to say *definitively* that Roche would have prevailed had the Boudreau Report been timely produced. But the defendants are to blame for that. It is anyone's guess what an unadulterated summary judgment record would have looked like, had fair play been the rule in discovery.[33]

Hyde expresses incredulity that there could be any material difference between a scenario in which, on the one hand, Roche tried to argue, as he did in his summary judgment motion as filed, that the availability of the publicly available PRMD files provided a basis for charging Hardy with knowledge of

---

[33] Ram's Gate argues, in the alternative, that Roche actually *did* have evidence Ram's Gate knew of the Boudreau Report before the closing of the transaction in December 2006. According to Ram's Gate, among the 2,316 pages of documents Hardy produced the day before the second session of his deposition on February 8, 2013, was an email showing that, just before filing the underlying action, Hyde brought the Boudreau Report to the attention of O'Neill and John, told them it came from Hardy's files, and asked them whether they had seen it before. O'Neill responded that he had not, and John responded that he was "pretty sure" he had not. Pointing to this email exchange, Ram's Gate argues that Roche could, in fact, have argued that Hardy had possession of the Boudreau Report prior to the December 2006 closing, but either chose not to do so or as a result of the negligence of his attorneys failed to appreciate that such an argument was available. It takes this position despite the fact the production in question (which was in response to the subpoena served on Hardy in May 2012) took place *after* Roche framed the issues to be decided in his opening summary judgment papers. We reject it on the ground that Roche cannot reasonably have been expected to add a new argument to his motion mid-stream, at the reply stage of briefing, having already framed the issues to be decided in his statement of undisputed facts.

76

the Boudreau Report by inquiry notice (an argument Judge Daum rejected in denying summary adjudication on the tort claims in the underlying action), versus, on the other hand, the argument he might have made based on a scenario in which Winter visited the PRMD and copied the Boudreau Report from the publicly available files.  We think there is a material difference between these two scenarios.  In his summary judgment motion, Roche was unable to close the gap between what Hardy might have learned from the PRMD files and the information actually gathered for him in the course of his 2005 due diligence.  Tying the Boudreau Report to Hardy would have closed that gap, thus supplying a factual foundation for charging him with knowledge of the document by inquiry notice.

The *Seeger* line of cases, holding that the fact that the victim had constructive notice of the truth from public records is no defense to fraud, illustrates why this distinction is important.  Relying on *Alfaro*, *supra*, 171 Cal.App.4th at pp. 1386, 1392–1393, Ram's Gate used the *Seeger* rule to defeat summary adjudication of its fraud and negligent misrepresentation claims in the underlying case.  *Seeger* left Roche with, at most, an argument that the availability of the Boudreau Report in the PRMD files might be relevant to whether Ram's Gate's reliance was reasonable (*Bishop Creek Lodge v. Scira* (1996) 46 Cal.App.4th 1721, 1734 (*Scira*)), an issue Judge Daum found raised issues of fact.  Hyde's discovery strategy gave Roche no other option but to assume that posture.  And it is here that the evidence the Boudreau Report was in the 2005 Due Diligence Binder—along with the duty of inquiry triggered by facts Hardy actually knew—would have made a difference.  "[T]hough defrauded buyers will not be deemed to have constructive notice of public records, this does not insulate them from evidence of their actual knowledge of the contents of documents presented to

77

them or from being charged with inquiry notice based on those documents." (*Alfaro*, *supra*, at p. 1389, citing *Scira, supra*, at p. 1736.)

Hyde contends that Roche could not have defended by pointing to Ram's Gate's knowledge because breach of a contractual duty of disclosure is "akin to a strict liability" claim. But that is incorrect. Whether a real estate buyer suing for nondisclosure seeks to state a cause of action sounding in contract (*RSB Vineyards, LLC v. Orsi* (2017) 15 Cal.App.5th 1089, 1097, 1103 (*RSB Vineyards*)) or in tort (*Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1520), in "either event [his] allegations must reveal a fraud." (*Reed v. King* (1983) 145 Cal.App.3d 261, 264 (*Reed*).)[34] " 'The elements of actual fraud,

---

[34] " 'A real estate seller has both a common law and statutory duty of disclosure. . . . "In the context of a real estate transaction, '[i]t is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property . . . and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer. [Citations.]' [Citations.] Undisclosed facts are material if they would have a significant and measurable effect on market value. [Citation.]" . . . Where a seller fails to disclose a material fact, he may be subject to liability "for mere nondisclosure since his conduct in the transaction *amounts to a representation of the nonexistence of the facts which he has failed to disclose.*" ' " (*RSB Vineyards*, *supra*, 15 Cal.App.5th at p. 1097, quoting *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161.)

The contractual disclosure commitment imposed on Roche here, though quite detailed in its specification of examples of expected disclosure materials, "did not impose any additional disclosure requirements beyond those imposed by law" (*RSB Vineyards*, *supra*, 15 Cal.App.5th at p. 1097, fn. 3) since the required disclosures were limited to "facts, events, conditions or agreements which have a material effect on the value of the ownership or use of the Property" (PSA, at ¶ 10) under circumstances where Roche knew the buyer would have a full opportunity, "at its expense, and in its discretion, to inspect any aspect of the Property to determine Buyer's satisfaction with the condition thereof." (*Id*. at ¶ 9 (b).) Thus, the PSA simply tracked Roche's common law and statutory disclosure duty.

whether as the basis of the remedy in contract or tort, may be stated as follows: There must be (1) a false representation or concealment of a material fact (or, in some cases, an opinion) susceptible of knowledge, (2) made with knowledge of its falsity or without sufficient knowledge on the subject to warrant a representation, (3) with the intent to induce the person to whom it is made to act upon it; and such person must (4) act in reliance upon the representation (5) to his damage.' " (*Reed*, *supra*, 145 Cal.App.3d at p. 264, italics omitted.)

" 'Concealment' and 'material' are legal conclusions concerning the effect of the . . . facts pled." (*Reed*, *supra*, 145 Cal.App.3d at pp. 264–265.) And "[c]oncealment is a term of art which includes mere nondisclosure when a party has a duty to disclose." (*Id.* at p. 265, citing *Lingsch v. Savage* (1963) 213 Cal.App.2d 729.) In the absence of a fiduciary duty or active concealment by deceptive obstruction of the buyer's ability to learn the truth (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 346–347), liability for "mere nondisclosure" (*Lingsch*, *supra*, at p. 738) in a real estate transaction may rest on the breach of a contractual duty of disclosure. That is the common thread running through each of Ram's Gate's causes of action against Roche.[35] And in "mere nondisclosure" cases, the plaintiff has the burden to show that the seller knew the undisclosed information was "not known to, or within the reach of the diligent attention and observation of the buyer." (*Id.* at p. 735.) Had Roche been able to show he was being sued for failing to disclose information Ram's Gate already knew—actually, or by imputation through its attorneys or through John—this is the claim element Roche could have attacked by

---

[35] The defendants point out, and Hyde features as one of his lead arguments, that Ram's Gate also alleged affirmative misrepresentation as a basis of liability. We address this strand of Ram's Gate's fraud allegations in Section III.C.4., *post*.

summary judgment motion. But Ram's Gate's discovery misconduct blocked him from doing so.

Accordingly, we conclude that, because Roche was prevented from moving for summary judgment on the ground that Ram's Gate sued him for failure to disclose information already known to it—actually or by imputation—he has sufficiently shown that Ram's Gate deprived him of a meaningful hearing on the merits of his summary judgment motion, which triggers the fraud or perjury exception. The same holds true for defendants' victory on the first appeal in this case, where this court reversed the grant of summary adjudication on Roche's contract cause of action. That appeal having been decided on the same record Ram's Gate relied upon to establish triable issues on Roche's tort causes of action, the same analysis applies.

### 4. What the Defendants Contend Are Independent Bases for Liability, Distinct from the Allegation that Roche Failed To Disclose the Boudreau Report, Do Not Establish Ram's Gate Had Probable Cause To Sue

Retreating to a last line of defense, Ram's Gate argues "[e]ven if Hardy and Ram's Gate could be charged with constructive notice of the Boudreau Report prior to closing, this single fact would not have changed the outcome of Roche's summary judgment motion" because there were multiple grounds for charging Roche with breach of contract, including failure to disclose the existence of the Boudreau Report, failure to disclose the existence of the Conforti site plan, and failure to disclose that the original planned location of the winery had to be moved because of its proximity to active fault traces. "Any one of these breaches," Ram's Gate contends, "provided Ram's Gate with probable cause to sue for breach of contract." Hyde joins all of these arguments, but with some unique points of focus, first on what he claims is Roche's false representation that the building pad was ready to build upon

immediately, and second on a contention that the significance of the Boudreau Report is exaggerated.

### a. Arguments made by all defendants

Although here again the form of the argument differs coming respectively from Hyde and Ram's Gate, its logic is the same in the versions advanced by all defendants. We are asked to accept a framing of the claims in the underlying case against Roche as having encompassed more than simply a failure to disclose evidence of active fault traces. And with the underlying case framed broadly to include multiple, independent bases of liability, we are urged to put aside any issues surrounding the Boudreau Report as only a distraction, for even assuming the Boudreau Report had been produced on day one of the underlying lawsuit, so the argument goes, it would not have changed the outcome—Ram's Gate would still have defeated Roche's summary judgment motion, and at most we would be looking at claims on which there were triable issues.

The court in *Cuevas-Martinez, supra,* 35 Cal.App.5th 1109, a recent case evaluating probable cause at step two of an anti-SLAPP motion, rejected a similar line of argument from the malicious prosecution defendant there. "In the context of a malicious prosecution action," the court explained, " 'When a complaint alleges multiple theories of liability or "counts," the counts "are merely ways of stating the same cause of action differently." [Citation.] Accordingly, the only way that a litigant can show probable cause for the cause of action as a whole—or for the "primary right"—is to show probable cause for *each* of the counts or theories alleged.' [Citation.] Thus, even when the prior lawsuit involves multiple causes of action, the subsequent malicious prosecution action seeks 'to vindicate a single primary right—the right to be free from defending against a lawsuit initiated with malice and without probable cause.' [Citation.]" (*Id.* at pp. 1118–1119.) This

holding applies here. By showing prima facie that any one of what Ram's Gate now characterizes as its multiple bases for suing was without probable cause, Roche has met his anti-SLAPP step two burden.

Arguing to the contrary, the defendants rely heavily on *Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438 (*Antounian*), which involved a case brought in federal court against George and Marijeanne Antounian by manufacturers of upscale accessories for trademark infringement and counterfeiting. (*Id*. at pp. 441–442.) The manufacturers alleged the Antounians were selling counterfeits of these accessories. They based their complaint on purchases by private investigators who were somewhat confused about the addresses where they actually bought the counterfeits because independent vendors had set up stalls and stands in front of the Antounians' shop and adjoining shops. (*Id*. at pp. 442–444.) The investigative reports included some allegations pertaining to the Antounians' shop that were later recanted, while some allegations about the shop were not. (*Id*. at pp. 445–446, 454.)

Because the confusion left room for a jury to find that some of the counterfeit goods had come from the Antounians' shop, the Court of Appeal concluded the allegations against the Antounians that remained unrecanted were sufficient to show probable cause for bringing the action and hence barred a subsequent malicious prosecution action. (*Antounian, supra,* 189 Cal.App.4th at pp. 446–453.) Defendants claim *Antounian* supports their position that where some facts are shown not to support a cause of action, but other facts relied upon by the plaintiffs in the underlying action remain viable, the underlying action must be viewed as supported by probable cause, and a subsequent malicious prosecution action is barred.

We reject these arguments. The reasoning in *Antounian* applies only if the second barrel of a double-barreled theory of liability, by itself, independently, could support liability. That is not the case here, as confirmed by O'Neill's deposition testimony, both individually and as Ram's Gate's PMQ designee. Every strand of Ram's Gate's various theories of misrepresentation and nondisclosure is merely another way of restating its core allegation about nondisclosure of an active fault trace. They all seek recovery for the same damage,[36] which is the determining factor under California's primary rights approach to defining a single cause of action. (*Slater v. Blackwood* (1975) 15 Cal.3d 791, 795 ["the 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant"].) Thus, none of these theories of liability stands independently as a separate cause of action.

Stated alternatively in terms of the elements of fraud Ram's Gate was required to prove, these theories may allege relevant evidentiary facts but they add nothing *material* beyond what the Boudreau Report already reveals. While in many cases the issue of materiality will present questions of fact (*Reed*, *supra*, 145 Cal.App.3d at p. 265), here it may be decided as a matter of

---

[36] O'Neill Deposition (April 5, 2016) at page 142 ("[Q]: I'm just trying to find out what damages you contend have been suffered. You've given me five components, correct? [¶] [A]: Correct. [¶] [Q]: Okay. And all five of those are from the alleged failure to disclose an active trace fault on the property. [¶] [A]: Correct."); see also O'Neill Deposition (May 3, 2013) at page 235 ("[Q]: So the only information that you have now, the only different information that you have now that you didn't have before the close of escrow is that you say nobody told you that there were active trace faults on or near the location of the winery, right? [¶] [A]: Correct. [¶] [Q]: If that information had been disclosed to you, the information that you have now and the information you had then would be identical, correct? [¶] [A]: Correct.")

law, on undisputed facts, since the question is whether any of the additional items Roche allegedly failed to disclose or misrepresented added anything, incrementally, beyond what Ram's Gate already knew or was charged to know. The answer is no, in light of O'Neill's testimony admitting that all of Ram's Gate's other alleged nondisclosures and misrepresentations are subsidiary to the claim that Roche failed to disclose an active fault trace.

b. *Arguments made by Hyde*

Hyde's unique spin on the *Antounian* line of argument suffers from the same defect, but fails of its own accord for additional reasons. By focusing its attention exclusively on allegations surrounding the Boudreau Report, Hyde argues, the trial court failed to take into account a set of misrepresentation allegations concerning the building pad that, independently of whether Ram's Gate was, or was not, aware of active fault traces revealed by the Boudreau Report, supported liability for breach of the PSA. In fact, we are told, these building pad allegations—for failure to disclose that no soils report had been done, that as a result the pad had been built without a permit, and that there were 50–100 feet of fill beneath it, which made soils testing for evidence of active fault traces cost prohibitive—stated the "central claim" of Ram's Gates's breach of contract case all along.

Here, Hyde argues that, when Roche disclosed the HLA Proposal as part of his November 2006 pre-closing disclosure package, Ram's Gate concluded from the very fact of the pad's existence that the seismic investigation work proposed by HLA must have been done. According to Hyde, that was not only consistent with the affirmative representation in the Offering Memorandum that the building pad was county-approved, but it enhanced the believability of the immediate buildability representation. This argument reads more into the evidence than is actually there. To understand

84

why, it is important to bear in mind that the building pad Roche sold to Ram's Gate as an appurtenance to the property was the *foundation* for a building, not a building structure. The HLA Proposal specifically addressed the possibility that, in 1997, Roche was planning to erect a building structure on the pad. It did not address construction of the pad itself, without the building.

To the extent Ram's Gate meant to allege deficient engineering, per se, by putting the word "engineered" in quotes in the operative complaint— which might be construed as an attempt to signal it was raising questions about the physical integrity of the pad itself, or about the pad's suitability to hold a building—that interpretation of the claim is at odds with O'Neill's understanding of it. When asked in deposition, "You agree that the building pad was engineered. Correct?" he answered: "Well, look, I'm not an expert, so somebody would have to review that . . . . We've never questioned that the pad was engineered by Ghilotti. We're not debating the engineering of the pad."[37] The idea that Ram's Gate's building pad allegations pled a "standalone" defective engineering claim is also legally unsupportable. The complaint is too conclusory to support such a claim. There are no allegations, for example, of cracks or other physical defects that might have evidenced an improperly "engineered" building pad, and there is no claim for damages incurred as a result of some need to repair or rebuild it.

The permitting aspect of Ram's Gate's purported "standalone" building pad claim fares no better. Nowhere does Ram's Gate allege damages in the

---

[37] O'Neill Deposition (May 3, 2013) at page 234; see also O'Neill Deposition (April 5, 2016) at page 146 ("[Q]: I just want to make sure that . . . your claim related to the building pad is exclusively limited to the possibility that there's an earthquake trace fault under the building pad, correct? [¶] [A]: Correct. That's correct.")

form of anticipated costs of undergoing another permitting process specific to the building pad, apart from what was always going to be required if a building were planned for the pad.  The absence of any such damages request is understandable.  The HLA Proposal expressly states that a soils report would be required if a structure were ever built on top of the pad.  Despite this specific written statement addressing the point, Ram's Gate contends it was surprised to find out that "[b]efore the County would approve any construction on the 'engineered' pad, additional trenching and geological analysis had to be performed."  Ram's Gate's own lawyer, Hardy, was not confused about this.  He testified he always understood it would be necessary to undertake a permitting process for any structure Ram's Gate wished to build on the building pad, and that as part of the permitting process a soils report would be necessary.[38]  With that understanding, the representation that the pad was "immediately buildable" was true and therefore could not have caused Ram's Gate any damage.  (*Saffie v. Schmeling* (2014) 224 Cal.App.4th 563, 566, 570–571 [where selling broker disclosed a 24-year-old fault hazard study and represented that property sold to plaintiff " 'has been declared buildable,' " there was no obligation to advise buyer of need to update the study and the buildability representation could not have caused any damage to the plaintiff because it was true].)

If Ram's Gate genuinely believed it could skip the step of obtaining a soils report for any structure it wished to build on the pad because of the representation of "immediate buildability" in the Offering Memorandum, it was subjectively laboring under a legal misunderstanding that was at odds

---

[38] Deposition of Lester Hardy (June 14, 2012) at pages 52–53 (Hardy testifies that, to construct anything on top of the building pad, he understood a building permit would be required, and additional investigation or approval would be required for a "geotechnical site").

with knowledge imputable to it from its lawyer.  "Here we have a question of law[]—the existence, the provisions, the meaning, and the applicability" (*Watt v. Patterson* (1954) 125 Cal.App.2d 788, 793) of permitting requirements for the construction of a structure on the building pad.  This is not a situation in which Roche proposed to sell Ram's Gate a turnkey project by providing a full set of architectural plans for a building and then representing, falsely, that a permit had already been issued for the pad *and* the building as a package, leaving construction as the only remaining task.  "All of the pertinent facts" here—most importantly, the fact that there was no building structure on the pad when Ram's Gate acquired the winery, nor were there any current plans for a building, which meant that a seismic hazard study would be required of anyone who proposed to put one there— were "equally well known to both parties."  (*Ibid.*)

In the last of the many probable cause arguments presented in these appeals, Hyde presents an idiosyncratic reading of the record, shared by no other party to this litigation, that the Boudreau Report is simply not very important compared to other nondisclosures and misrepresentations alleged by Ram's Gate.  According to this proposed interpretation of the facts, Boudreau identified a fault trace that was 600 feet distant from the building pad, and as a result, it was the nondisclosure of the Conforti site plan, not the Boudreau Report, that was the most misleading omission here.  This is so, Hyde argues, because only the Conforti site plan, together with the undisclosed information that Roche had to move the location of his winery because of "findings" made by Conforti, would have alerted Ram's Gate to the fact there was an active fault trace near the winery building and the building pad behind it.  The argument hinges on the chronology; Conforti came *before* Boudreau, Hyde points out, overlooking the fact Conforti (who Hyde and

87

Ram's Gate both incorrectly refer to as an "engineer") revised his site plan in 1988 and that, as an architect, he did not do any independent geological work.

More fundamentally, Hyde's "much ado about nothing" argument fails to take account of what Boudreau actually found—evidence of multiple active fault traces, including one to the north of the winery across Arnold Drive, and another very close to the winery where he did his trenching at the location Hart identified in 1982, traversing the knoll itself. While we see a number of problems with Hyde's argument that Boudreau "found no active fault traces anywhere near" the winery site shown on the Conforti site plan, the most basic is that it incorrectly presupposes Boudreau found only one active fault trace and that that fault trace was hundreds of feet distant from the winery building. Suffice it to say this portrayal of the evidence is inconsistent with the RGH Report, which Hyde himself commends to us for an accurate summary of Boudreau's findings. RGH, too, found multiple active fault traces, including one which it identified as the "main trace of the Rodgers Creek fault" some distance away from the winery site, across Arnold Drive, at the intersection of the Petaluma formation and the Sonoma volcanics. But that is not the only fault trace Boudreau and RGH found, nor is it the one they were focused upon. (*Ante*, at pp. 6–8, 16, fn. 10.)

## D. *Malice*

The fact that the defendants filed and maintained an action that lacked probable cause, on this record, raises an inference of malice. While the absence of probable cause alone is insufficient to establish a prima facie case of malice (*HMS Capital*, *supra*, 118 Cal.App.4th at p. 218; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498), there is more here because of ethically questionable decisions by Hyde not to produce the 2005 Due Diligence Binder in discovery. We conclude that the pattern of discovery

88

misconduct and the manner in which it was carried out solidify Roche's showing and make it sufficient to meet his prima facie burden on the issue of malice.

The Ram's Gate defendants do not contend on appeal that evidence of their malice was lacking, but Hyde does. The singular aggressiveness of his position, in our view, betrays its weakness. Hyde is in the least credible position to make such a claim, since it was Hyde who discovered the Boudreau Report in the 2005 Due Diligence Binder before filing the underlying action. It was Hyde who, as the attorney representing Ram's Gate, was responsible for undertaking a reasonable investigation into the facts before making irresponsible accusations in a pleading. Rather than acknowledge the possibility of any misjudgment, Hyde doubles down.

The four-and-a-half-year record of withholding discovery, we are told, is not his fault. Roche, Hyde argues, is to blame because Simon was negligent in not serving a subpoena seeking production of the JHP Land I client files on the correct party. And according to Hyde, the only reason the JHP Land I client files were eventually produced was due to Hardy's "unethical" decision to produce materials from that file. He even claims to have no idea why Hardy failed to produce the Boudreau Report in the spring of 2012, as if his request of Hardy not to produce the client files of JHP Land I never happened. Ultimately the sheer brazenness of the posture Hyde assumes may present credibility issues for the finder of fact to assess, but for now it adds nothing to the weight of his arguments. If anything, it detracts from them.

Whatever else happens here, the Ram's Gate defendants seek to preserve their ability to argue "[t]here can be no imputation to a client of his attorney's misconceived legal analysis so as to void the client's good faith

89

reliance on his counsel's advice as providing probable cause." (*Brinkley v. Appleby* (1969) 276 Cal.App.2d 244, 247.) They point out that "nonattorney defendants can usually demonstrate the existence of probable cause, and thus avoid liability, by evidence showing that they relied on the advice of counsel in good faith after full disclosure of the facts." (*Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th at p. 496, fn. 24; see also *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1556 [" 'Probable cause may be established by the defendants in a malicious institution proceeding when they prove that they have in good faith consulted a lawyer, have stated all the facts to him, have been advised by the lawyer that they have a good cause of action and have honestly acted upon the advice of the lawyer.' "].) About this, all we need say is that issues concerning any advice-of-counsel defense by the Ram's Gate defendants must be sorted out at trial.

## E. *Guidance on Remand*

"Based on our de novo review, we conclude that, for purposes of prong two of the anti-SLAPP statute (§ 425.16, subd. (b)(2)), if we credit the evidence that [Roche] submitted in opposition to [defendants'] anti-SLAPP motion, including favorable inferences from that evidence[,] . . . [Roche] set forth a sufficient prima facie showing of facts that he will prevail in proving" the elements of his malicious prosecution claim. (*Kinsella, supra,* 45 Cal.App.5th at p. 463.) "By this ruling—indeed, by any statement contained in this opinion—we express no view as to whether [Roche] will or will not be able to prove to the satisfaction of a trier of fact any of the three elements of his cause of action for malicious prosecution." (*Ibid.*) By analogy to injunctive relief, our affirmance of Judge Chouteau's determination that Roche is likely to succeed on the merits is no more determinative of the outcome of this case than an order granting preliminary injunctive relief

90

would be on the question whether permanent injunctive relief should issue after trial.

Roche is now entitled to proceed to trial. (*Bergman*, *supra*, 129 Cal.App.4th at p. 18 [determination that malicious prosecution plaintiff met her prima facie burden under Code Civ. Proc., § 425.16, subd. (b)(1) is law of the case, barring summary judgment against her, unless defendant later comes forward with "additional or different evidence that would, as a matter of law, *conclusively* negate plaintiff's prima facie case"].) Although our decision resolving these appeals will prevent the defendants from "reargu[ing] the proposition that [Roche] has not presented sufficient evidence to go before a trier of fact" (*Bergman*, *supra*, at p. 21), what we hold here "will have no impact on the trial of this matter" (*ibid.*) as to matters of fact. Roche still must "prove [his] case for malicious prosecution by a preponderance of the evidence" (*ibid.*), and "[u]pon the commencement of the trial, the impact of the law of the case doctrine will simply disappear" (*ibid.*), other than to provide guidance as to the applicable law. (Cf. *Crespin v. Coye* (1994) 27 Cal.App.4th 700, 708 [appellate rulings on review of a preliminary injunction may become law of the case in subsequent proceedings in the same case where court of appeal decides issues of law presented on undisputed facts]; *Los Angeles v. Los Angeles Bldg. & Const. Trades Council* (1952) 109 Cal.App.2d 81, 87 [same].)

At trial, the court must first address as a preliminary matter the applicability of the fraud or perjury exception to the interim adverse judgment rule. Since fraud or perjury is not a substantive element of Roche's malicious prosecution claim, and has procedural consequences only, any fact-finding that is necessary in connection with it is for the court to undertake, approaching the inquiry procedurally—by phasing the trial, for example—in

whatever manner it deems most fitting.  Based on the six volumes and 2,500 pages of appendices submitted to this court, it appears to us that Roche has met his prima facie burden to show discovery misconduct that is sufficiently serious, pervasive and impactful to trigger the fraud or perjury exception.  Still, we recognize the possibility that the record may be incomplete in some respects and that the defendants may have something more, or different, to say by way of explanation or mitigation.  What we have said about the defendants' conduct, and especially Hyde's, is harsh; it is intended to be, as would befit a final determination that the prima facie showing Roche has made out is true.  But we emphasize once again that we have not made a final determination of these discovery misconduct issues at this procedural stage of the litigation.  We leave that to the trial court, where the events we have discussed occurred.

Should the trial proceed to the merits of the malicious prosecution claim, the element of lack of probable cause will also be for the court to decide, subject to a preliminary determination of certain factual questions by the trier of fact prior to the ultimate legal determination of probable cause.  The differing positions Hyde and Ram's Gate have taken in these appeals on the issue of whether Hardy ever possessed the Boudreau Report underscore the need for this preliminary fact-finding.  (*Ante*, at pp. 42–43, fn. 21.)  We also note that Roche argues lack of probable cause on two levels.  First, he argues that John had possession of the Boudreau Report in 2005.  If that is true, and Hyde knew it, it would decisive.  But Roche also contends that even if the Ram's Gate principals were ignorant of the Boudreau Report as of the closing date, Hyde, objectively, should have known better than to counsel the bringing of a claim.  He was legally incorrect that none of the seismic information revealed in the Boudreau Report could be imputed to Ram's

92

Gate, but the ultimate question of lack of probable cause may come down to just how wrong he was. Was his view of the imputation issue so flawed that no reasonable attorney would have proceeded or continued to proceed on the basis he did?

To evaluate Roche's lack of probable cause arguments at both levels, it will be important to assess the state of Hyde's knowledge of the pertinent facts not only when the lawsuit was filed, but as it was being pursued. The extent of his awareness of who had actual possession of the Boudreau Report prior to the closing, and at what point in time possession of the document changed hands, are all questions that may be central to this analysis. Legally, as we have explained, it is sufficient to charge the Ram's Gate principals with knowledge of information in the hands of their attorneys, but the objective reasonableness of the position Hyde took in premising a suit against Roche on the position his clients could avoid any such imputation may depend, in part, on what Hyde knew of the facts that would drive the case for imputation. He claims he made an "assessment" of this critical issue, which suggests he had a factual basis for his ultimate judgment. Perhaps he did; or perhaps the arguments we see from him concerning the 2005 Due Diligence Binder were developed after the fact, as appears to have been the case with his effort to explain away his continuing violation of Judge Daum's February 2012 production order in hindsight, which would suggest he was intent on achieving a result, heedless of the law.

There may be a number of other preliminary questions of fact that will need to be explored. It is for the trial court to determine exactly what must be examined and how to frame all of the issues to be tried for decision along with the other elements of Roche's malicious prosecution claim, while preserving its exclusive role in deciding the ultimate issue of probable cause.

93

## IV.  DISPOSITION

The trial court's order of January 31, 2017, denying defendants' anti-SLAPP motions is affirmed.  Roche shall recover his costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

| | |
|---|---|
| Trial court: | Sonoma County Superior Court |
| Trial judge: | Honorable René Auguste Chouteau |
| Counsel for defendant and appellant Thomas F. Hyde: | Hinshaw & Culbertson<br>Edward F. Donohue<br>Jared W. Matheson |
| Counsel for defendants and appellants Ram's Gate Winery, LLC et al.: | Arnold & Porter Kaye Scholer<br>Steven L. Mayer<br>Sean M. SeLegue<br>Jonathan W. Hughes<br>John S. Throckmorton |
| Counsel for plaintiff and respondent: | Beyers Costin Simon<br>Bob Haroche<br>Peter L. Simon<br>Steven J. Bleasdell |

*Roche v. Hyde* A150459 / *Roche v. Ram's Gate* A150462